In re Application of L.L., FOR the
ADOPTION OF A MINOR,

and

In re M.D., Jr., L.L. and
M.D., Jr., Appellants,

M.D., Sr. and C.D., Appellees.

Nos. 94–FS–469, 94–FS–506.

District of Columbia Court of Appeals.

Argued Nov. 8, 1994.
Decided Feb. 9, 1995.

Gregory G. Garre, with whom Donna L. Wulkan, Walter A. Smith, Jr. and Melissa R. Jones, were on the brief, for appellants.

Thomas H. Kirkpatrick, for appellee M.D., Sr.

M. Lisanne Crowley, Susan M. Hoffman, and John E. McCarthy, Jr., filed a brief for Consortium for Child Welfare, amicus curiae, urging reversal.

Before TERRY and SCHWELB, Associate Judges, and BELSON, Senior Judge.

SCHWELB, Associate Judge:

These expedited appeals stem from two consolidated trial court proceedings relating to appellant M.D., Jr., now four years old. Appellant L.L., who has been M.D., Jr.'s foster mother for more than two and one half years, initiated the first proceeding, seeking leave of court to adopt him. In the second proceeding, M.D., Jr.'s guardian ad litem, who supports the foster mother's petition for adoption, asked the trial court to terminate the parental rights of appellee M.D., Sr., M.D., Jr.'s biological father. Following a six-day bench trial, the judge ruled in the father's favor and denied both petitions. We reverse the judgment and remand the case to the trial court with directions to terminate the father's parental rights and to grant the foster mother's petition for adoption.

## I.

## THE FACTS

At the conclusion of the trial, the judge made extensive findings as to the historical facts, most of them undisputed. She also made a number of findings of ultimate fact which are arguably irreconcilable with her evidentiary findings, and which appellants attack as clearly erroneous. We outline the facts as found by the judge.

*A. M.D., Jr.'s History.*

M.D., Jr. was born on October 13, 1990. His mother was a cocaine addict and abused cocaine during her pregnancy; M.D., Jr. tested positive for cocaine at birth. His father has been incarcerated for robbery and for indecent liberties with a minor, and has been hospitalized for serious psychological problems, which have resulted in several suicide attempts, homicidal ideation, and threatening conduct.

During the first seven months of his life, M.D., Jr. lived with both of his parents. His mother continued to use crack cocaine, and his father, who was unemployed for most of

this period, attempted to care for him.[1] When the father found occasional work as a janitor, however, he left M.D., Jr. with the mother. As the trial judge expressly found, "periodic child care from a cocaine-abusing mother simply was not best for the infant."

In May, 1991, the mother left M.D., Jr. with a neighbor whom the judge later described as "an unwilling caretaker." The father "decided he was going to go to work, rather than stay at home with the baby." Accordingly, the father surrendered M.D., Jr. to a police officer, who took him to the Department of Human Services (DHS). Two weeks later, the parents signed an agreement voluntarily placing M.D., Jr. with DHS for a period of ninety days. The agreement provided that at the end of this period, M.D., Jr. was to be returned to the parents unless the agency instituted neglect proceedings. In September, 1991, DHS did file a neglect complaint, and M.D., Jr. was subsequently committed to the custody of the agency by order of the Superior Court.

Upon being delivered to DHS, M.D., Jr. was placed at St. Ann's Infant and Maternity Home. He initially experienced periods of inconsolable crying often associated with prenatal exposure to cocaine.[2] He received specialized treatment at St. Ann's, and his condition gradually improved.

In February, 1992, M.D., Jr. was introduced to appellant L.L., the foster mother. On February 22, following a weekend visit, he was placed in L.L.'s home. He has lived there ever since.

During the time that M.D., Jr. has been in the care of DHS, the father has visited him somewhat intermittently;[3] the mother has come even less frequently. The judge found that, as between father and son, most or all of the visits went very well. The father was, however, boisterous and argumentative with social workers,[4] and his threat against one of them resulted in his being barred from the For Love of Children (FLOC) building. The father agreed to participate in drug testing and to register for outpatient treatment at St. Elizabeths Hospital but, as the judge expressly found, he "did not comply."

B. The Foster Home.

The trial judge made the following findings regarding the foster mother with whom M.D., Jr. was placed and the home in which the two of them now reside:

L.L. is a 34 year old trade union secretary, who works for a children's health care organization, who trained as a [FLOC] foster parent. . . .

She describes the daily activities. They are typical events in the life of a working single parent. She gets him up. She gets him ready for day care. She takes him to day care. She makes certain that he's stable and secure where he is, and she goes to work.

She picks him up. She feeds him. She reads to him. They play together. And she takes him to bed.

On the weekends they play. He is a part of her . . . extended family and family activities.

They live in a neighborhood of single-family homes with other children in the neighborhood. And they live specifically in a four-bedroom split level, with a playroom for M., Jr.

M. spends each day with a day care provider, from 7:45 a.m. to 5:30 p.m. Ms. L. shares her home with a female cousin, and the cousin's two sons, ages 7 and 12.

---

1. The judge found that "normal" bonding between father and son occurred during this seven-month period.

2. The judge was of the opinion that this crying may have resulted in part from the child's separation from his parents.

3. According to the testimony, the father visited only twice from February, 1992 to May, 1993. From then until the trial in March, 1994, he made twelve additional visits. In December, 1992, as a result of the father's poor visitation record, the agency's goal for M.D., Jr. changed from reunification with his father to adoption.

4. The judge found:

"All social workers, Ms. Janet Mullens of DHS, Ms. Tamitha Davis from FLOC, and Ms. Mary Catherine Larkin of St. Ann's, report that Mr. D. has repeatedly displayed temper and belligerence whenever they frustrated his attempt to reunify with his son."

The judge also found that during some of her few visits, the mother was "high" on cocaine.

Ms. L. has, since she had M. in her home, worked diligently with the staff at the National Children's Center and with Dr. V. to assist in improving M., Jr.'s development.

On those factual findings, the court concludes that this child appears to be bonded well, both to his natural father, and to his foster mother, but not to his natural mother.

## C. The Father.

M.D., Jr.'s mother has consented to his adoption.[5] The judge made extensive evidentiary findings regarding the father and his history, and we quote from them in some detail:

[M.D., Sr.] was born some time around 1961.... At age 15, which was about 1976, he committed his first suicide attempt. At that time, he was the victim of an abusive, alcoholic father.[6] He had left home, and he was living in the streets.

Two years later, at age 17, in about 1978, he was convicted for robbery, and was sentenced to five years. He further stated in his medical records that he had sold phenmetrazine [an unlawful drug] ... on the streets for profit.

Three years after that, at about age 21, in about [1981], he committed his first serious attempt to hang himself at Lorton. He was transferred to the John Howard Pavilion at St. Elizabeths. And this was immediately following news that his father had died of cancer.

Two additional suicide gestures occurred while the father was at St. E's.... At one point [in 1984] when he learned that his mother had been hospitalized for a heart condition after he thought that she had been slapped by his brother, he dropped exercise weights on his chest in an attempt to hurt himself.

Again, at the hospital following this incident, he threatened to put his brother in a wheelchair. He had some run-ins with other patients....

[In] June 1985, there was an attempted hanging at John Howard Pavilion at St. Elizabeths. Also, Mr. D. threatened a security guard, because the guard accused Mr. D. of molesting a female visitor to the hospital. At that point, he, Mr. D., was reported to be manipulative and belligerent, abusing alcohol and being generally abusive toward the staff. He was to have been discharged to an outpatient treatment program. He never kept appointments. And he was ultimately discharged finally in September of 1987.

In 1987, he married C.D. In 1988, he was convicted for child molestation, and sentenced to serve from January to November of 1989.

When he returned home from prison, he found that [C.D.], his wife, was prostituting herself and was heavily abusing cocaine.

In October of 1990, he returned to the hospital, complaining that he was afraid he would kill his wife because he couldn't stop her from using drugs. He also reported he was afraid he would kill his sister or sisters. At first he did not accept hospitalization when it was offered to him, because he thought he wouldn't act on his feelings. Two days later, he returned requesting voluntary admission. He left the hospital against medical advice when his wife delivered M., Jr. in October of '90.

Okay. In March of '92, he was again hospitalized because of his [homicidal] feelings towards his wife, who was still using cocaine. He again left the hospital against medical advice, and he was diagnosed as being depressed.... In October 1992, Mr. D. threatened one of the employees at St. Elizabeths, he claims for disrespecting him on the day before.

As previously noted, see note 4, *supra*, the father also threatened or harassed the social workers with whom he came into contact.

---

5. In a proceeding which is not before us on this appeal, the trial judge denied the mother's motion to revoke her consent. In this court, the mother supports the father's position.

6. Dr. Lanning Moldauer testified, as the judge noted, that M.D., Sr. claimed that his own father had sexually abused him. M.D., Sr. told Dr. Moldauer that, after his father's death, he (M.D., Sr.) wished he had killed him.

### D. The Expert Testimony.

Two court-appointed expert witnesses testified during the trial. Dr. Lanning Moldauer, a licensed psychologist, explained that he had been requested by counsel for the father to assist him "in finding those areas in which he might most favorably represent [M.D., Sr.] as a fit father for his son." Upon interviewing the father and extensively studying his social and medical records, Dr. Moldauer concluded that M.D., Sr. suffers from an antisocial personality disorder and that he would not be a fit father for M.D., Jr. Dr. Moldauer further testified that he knew of no way that the problem could be remedied during M.D., Jr.'s childhood years:

> I don't see any road here. I don't, I just don't see any course that's going to bring Mr. D. within the foreseeable future into conformity with what I would think would be the basic, even minimal, requirements of good parenting for a three year old child. It's a question we might revisit in 12 or 15 years and get a different answer to, but I don't see anything in the near future.

Dr. Moldauer based this conclusion on the father's extensive record of psychological disturbance, which included suicide attempts, threats to family members and to others, and admitted homicidal feelings; on his convictions of robbery and of indecent liberties with his stepdaughter; on his impulsiveness and inability to plan ahead; on his unwillingness to accept responsibility for his actions and his consistent blaming of others for his troubles; and on his inability or unwillingness to keep appointments [7] or to carry out commitments (*e.g.* his failure to comply with his outpatient treatment regimen). Dr. Moldauer testified that

> perhaps the prime requisite of somebody dealing with the young child is the ability, at least temporarily at times, to surrender an immediate response to one's own needs in behalf of acting upon the perceived needs of that child. Which means you need to be able not to act impulsively but

you also need to be able to extend yourself and your sense of empathy to understand what that child needs and not to see the extension of your own needs.

> Q Do you think Mr. D. is capable of doing that?

> A I think he has extraordinary difficulty doing that.

Dr. Floyd Galler, a psychiatrist and psychoanalyst employed by DHS, also testified that M.D., Sr. suffers from an antisocial personality disorder. He based this diagnosis on the father's

> tendency for impulsivity, a tendency to become very violent in actions or in speech, a failure to assume responsibility for any of the consequences of his own actions and a tendency to externalize bad consequences and place the blame and responsibility for the bad consequences on to the environment.

Dr. Galler explained that these problems made the father an "unfit custodian" for M.D., Jr. because most three-and-a-half year old boys "require a great deal of patience and consistency." Accordingly, a parent like M.D., Sr., who "flies off the handle," who can "become very violent in [his] actions," and who "is not able to be consistent," would be unable to parent adequately a boy of M.D., Jr.'s age.

Dr. Galler also described M.D., Jr.'s interaction with his foster mother as "very, very warm, very encouraging, very affectionate." In response to a question from counsel regarding the potential consequences for M.D., Jr. if he were removed from L.L.'s care, Dr. Galler testified as follows:

> Well, I mean first of all there is a lot of experience, and there's, you know, a lot of information about that kind of thing. On the short term basis I would expect some signs of regression, for example, [he] might lose his toilet training, he might have some regression in his speech, there might be even increased difficulties with sleep disorders, difficulties in going to sleep, soiling himself at night, even an

---

7. The father has a criminal conviction for willful failure to appear in court. In the present case, he failed to appear for a hearing on the application for TPR. It turned out that he was incarcerated at the time as a result of his failure to appear for a child support hearing which related to one of the father's two other children by a different woman.

increase in his—in his—his nightmares. If he was, let's say, placed—if he was placed with someone now he might appear to get over this, you know, after a number of months, and I use the word intentionally, appear [to] get over it.

But our experience is that when a youngster is removed, you know, from let's say the psychological parent it is—can be disastrous. Twenty-five percent of people who lose a parent, you know, up to the age of five, become predisposed to developing major depressive disorder in adult life.

Dr. Galler recommended that M.D., Sr.'s rights should be terminated and that M.D., Sr. should not be permitted to visit his son.[8]

### E. The Trial Judge's Ultimate Findings.

In addition to her evidentiary findings, the trial judge made "ultimate" findings applying the statutory criteria for termination of parental rights, see D.C.Code § 16–2353 (1989 & Supp.1994), and especially with respect to M.D., Sr.'s fitness as a parent. Addressing the father's mental health history, the judge concluded that

he has a history of antisocial behavior and lots of threats. In the main, he doesn't carry out his threats. He provokes people. He acts belligerently ... [A]ll the times he has felt homicidal towards sisters and family members, who don't help him, except at an extreme cost. I'll help you only if you let me adopt your child. He even explains the molestation [charge], one which he denies, but claims that he pleaded guilty to it in order to avoid a longer sentence after trial.

After discussing the father's "at least" average intelligence, his "reasonable" social skills, and his "defeatist attitude that might respond to help in terms of increasing his motivation," the judge concluded that *"there*

*is no, repeat, no significant disorder of his personality."* (Emphasis added).

Throughout her findings, the judge expressed irritation that various District of Columbia agencies had failed to provide the father (and, in some instances, the mother) with services to which the judge believed that they were entitled. According to the judge,

that is precisely the crux of the problem in this case. No services were provided. No one bothered to assist mother, whose needs were enormous, or father, whose needs could easily have been met.[9]

She concluded that the father has "the potential to react in a socially acceptable manner," but that he needs

therapeutic support, such as a therapist or perhaps the homebuilders intensive in-home support program, perhaps vocational rehab, and definitely homemaker childcare services. But even without such services, this court concludes that Mr. D. is mentally and emotionally well, notwithstanding his history.

Summarizing her decision, the judge held that "the guardian ad litem has failed to prove by clear and convincing evidence that it is in the child's best interest for the court to terminate the father/child relationship." She further concluded that M.D., Sr. was a "fit father" and that

the child is entitled to be raised by his fit father, who has not abandoned him, and who has grasped his opportunity to be a parent. To ... the extent to which he is estranged from his child, [this] is at least, in part, attributable to the failure of ... several agencies to even try to meet his needs so that he could meet his child's needs.

---

8. Dr. Galler also testified about a psychological experiment which he conducted with M.D., Jr., in the presence of M.D., Sr., which persuaded Dr. Galler that the boy was *reluctant to go to his* father. The judge questioned Dr. Galler extensively on this point and, in her findings, she rejected Dr. Galler's conclusion and gave her own interpretation of the results of the experiment. We have not accorded any appreciable weight to the disputed experiment in reaching our decision in this case.

9. The judge found that after the father had placed M.D., Jr. with D.H.S., the agency's social worker "kept rebuffing the father's attempts to regain custody by cryptically stating, quote, we're not a babysitting agency, unquote. Meaning, perhaps, that once you give a child away, you can't easily get him back, otherwise that makes the agency a babysitter."

The agencies who've been involved in the care of M., Jr., have failed [to help] the child reunify with the father. Instead they have tested the father as he struggled against the odds.

Under the circumstances, then, the petition to adopt is denied. And the motion to terminate parental rights is likewise denied.

These appeals followed.[10]

## II.

## LEGAL DISCUSSION

### A. The Standard of Review.

■ In adoption cases, and in proceedings to terminate parental rights, the decisive consideration is the best interests of the child. *In re L.W.*, 613 A.2d 350, 355 (D.C. 1992); *In re I.B.*, 631 A.2d 1225, 1231 (D.C. 1993). "[A] child's best interests are presumptively served by being with a parent, provided that the parent is not unfit." *In re S.G.*, 581 A.2d 771, 785 (D.C.1990). "This holds true even where, in a contest between a biological parent and a non-parent, the latter is in more favorable financial circumstances." *L.W., supra,* 613 A.2d at 356.

■ The trial judge found that M.D., Sr. was a fit father and, obliquely, that it was in M.D., Jr.'s best interest to be raised by his father.[11] We review her findings of fact under the "clearly erroneous" standard. *L.W., supra,* 613 A.2d at 359. The determination whether the best interests of the child war-

rant the termination of the father's parental rights is confided to the discretion of the trial court. *I.B., supra,* 631 A.2d at 1230. The same is true of the decision whether to approve an application for adoption over a biological parent's objection. *L.W., supra,* 613 A.2d at 359; *see also In re Baby Boy C.,* 630 A.2d 670, 683 (D.C.1993) (*Baby Boy C. II* ), *cert. denied, H.R. v. E.O.,* —— U.S. ——, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994).

Findings of fact which result from a misapprehension as to the applicable law, however, lose the insulation of the "clearly erroneous" rule. *Murphy v. McCloud,* 650 A.2d 202, 210 (D.C.1994) (citations omitted). Similarly, the exercise of discretion must be founded on correct legal principles. *Link v. District of Columbia,* 650 A.2d 929, 934 (D.C.1994) (citations omitted). The child and the foster mother both contend that the trial judge's ultimate findings in this case, as well as her exercise of discretion, were undermined by various legal errors. We examine each claim of error in turn.

### B. The Asserted Legal Errors.

#### (1) The father's indecent liberties conviction.

■ In 1989, the year before M.D., Jr. was born, the father was charged with raping his seven-year-old stepdaughter, who was M.D., Jr.'s half-sister. The case was resolved by the father's plea to indecent liberties with a minor. He was sentenced to imprisonment

---

10. After announcing her oral decision from the bench, the judge entertained questions from counsel. The subsequent dialogue included the following:

> [COUNSEL FOR L.L.]: Dr. Galler testified that M. would suffer severely from being removed from Ms. L.'s care at this point in time. And I would ask you to make that a finding of fact.
>
> THE COURT: Oh, no. If I thought that was true, I wouldn't have ruled the way I did. No, I specifically do not find that this child cannot survive a reunification with his father, or that he would be devastated or that the harm would outweigh the benefits, or I wouldn't have ruled the way I have.
>
> I specifically did not credit Dr. Galler's conclusion; specifically did [not]. No, I'm absolutely certain. I mean, if you want the record to be clear, I'm absolutely certain that this child can reunify with his father, and that if

any agency does what the agencies in this town are required by law to do, the child will be best off. He will be able to be raised by his father in a secure, loving, and stable home.

> The father simply needs to get what he hasn't gotten yet, and that is some support services, respite care, in-home services, homemaker services. And even if Ms. L. is a fine, wonderful parent, the child is entitled to be raised by a fit, natural parent.
>
> So, I'm not finding that this child won't be able to handle that transition. I'm finding that he will.

11. The judge did not use the term "best interest," but her allusions to M.D., Jr.'s "right" to be with his fit father, and her statement that he would be "best off" with him, necessarily implies such a finding.

for one year and served approximately ten months.

In her findings, the judge acknowledged the conviction, but evidently attached little significance to it. She noted in passing, as we have seen, that the father "even explains the molestation charge, one which he denies." [12] On the basis of the transcript, the conclusion is inescapable that the judge treated the indecent liberties conviction as an unresolved charge, and a not so very important one at that.[13]

To adapt *In re Shillaire*, 549 A.2d 336 (D.C.1988),

> a guilty plea represents both a conviction of a crime and an admission by the accused of the underlying facts.... Thus, in pleading guilty to [indecent liberties], [the father] conceded that the government's proffer of the circumstances surrounding the offense was true.

*Id.* at 343 (quoting *In re Wolff*, 490 A.2d 1118, 1119 (D.C.1985), *adopted en banc*, 511 A.2d 1047 (D.C.1986)); *accord, In re Colson*, 412 A.2d 1160, 1164 (D.C.1979) (en banc); *see also Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969).[14] M.D., Sr. thus claimed to be a fit father for M.D., Jr., notwithstanding his own solemn admission in a court of law that he had sexually molested M.D., Jr.'s seven-year-old half-sister. A recent criminal conviction of indecent liberties with a minor surely has important legal consequences in a proceeding which must focus upon the safety and best interests of a child.

"Parental unfitness is a personal characteristic which, ordinarily, does not vanish overnight...." *New Jersey Div. of Youth & Family Serv. v. Wunnenburg*, 167 N.J.Super.

578, 408 A.2d 1345, 1348 (1979). We have stated in the related context of wife-beating that "a [husband's] past conduct is important evidence—perhaps the most important—in predicting his probable future conduct." *Cruz–Foster v. Foster*, 597 A.2d 927, 930 (D.C.1991). Similarly, in cases of child neglect and abuse, we have relied on

> studies suggesting that child abuse does not ordinarily consist of a single isolated act of molestation, and that substantial numbers of child abusers have harmed several siblings in the same family. This kind of information is, of course, relevant to a determination whether the ... younger children in this case were in imminent danger of abuse or neglect.

*S.G., supra*, 581 A.2d at 778 n. 11 (citation omitted).[15] In other words, when a man has sexually molested one child, that child's siblings are often in danger.

■ Under these circumstances, the father's indecent liberties conviction should have been treated as an important factor in determining whether reunification with the father was a plausible goal. A parent's propensity to abuse other children, when shown to be beyond reasonable hope of modification, may constitute too great a risk to any remaining child to permit a continued parental relationship. *Palmer v. Dep't of Health & Rehab. Serv.*, 547 So.2d 981, 983 (Fla.App. 5th Dist.1989); *see also In re Sarah T.*, 629 A.2d 53, 54–55 (Me.1993) (upholding statutory presumption that a parent who has been convicted of sexually abusing a child is unwilling or unable to protect children from jeopardy).

---

12. According to a physician's psychiatric assessment following the father's 1990 admission to Saint Elizabeths Hospital, the father was charged "after his wife's 7–year–old daughter talked to personnel at her school. Patient says he never did anything of the sort but admitted guilt in the course of a plea bargain because he felt no one would testify in his favor and he might receive a long sentence."

13. While questioning Dr. Moldauer, the judge referred to "alleged" molestation, but corrected herself: "No, it's not an alleged molestation, it was a conviction." Nevertheless, in her findings, she either credited the father's denials or, at

least, treated the charge as one that had not been conclusively established.

14. Unfortunately, neither party placed a transcript of the plea proceedings in the record, and we do not know the details of the prosecutor's proffer.

15. We held in *S.G.* that as a result of the father's abuse of his stepchild, his own three children were in "imminent danger" of abuse from him, notwithstanding the lack of any evidence that they themselves had been mistreated.

*(2) The alleged failures of the agencies.*

█ A constant theme running through the judge's findings in this case was her perception that any difficulties which M.D., Sr. might have in being a fit parent were the result of the failure of DHS, and perhaps of other agencies, to carry out their obligations vis-a-vis the father. Given the judge's finding that the father consistently abused and harassed the social workers who dealt with him, and considering the expert testimony regarding the father's consistent habit of blaming others for his own trials and tribulations, the rights and wrongs with respect to this issue do not all favor the father. But even if we were to assume, for the sake of argument, that this difficult and uncooperative parent was entitled gratis to extensive social services and that the agencies failed to provide them, *cf. In re A.C.*, 597 A.2d 920, 923 (D.C.1991),[16] then that assumption could not sustain the result which was reached below. As we recently had occasion to explain in *L.W., supra,* in rejecting the approach adopted by the trial judge in this case,

> ... even if, as [the judge] suggested in her order denying the TPR, the social workers might have been more cooperative, ... the remedy cannot be to prohibit an adoption which is demonstrably in [the child's] interest; *the child cannot be punished for the alleged wrongs of the bureaucracy.*

613 A.2d at 355 n. 11 (emphasis added and citation omitted). We reiterate that "the overriding consideration is the best interest of the child, which may compel the filing of a motion to terminate parental rights regardless of the defaults of public agencies in

seeking reunification of the family." *A.C., supra,* 597 A.2d at 925.[17]

*(3) Expert testimony.*

█ The trial judge heard testimony from two expert witnesses, Dr. Moldauer and Dr. Galler. Both men were appointed by the court; neither received compensation from any of the individual litigants. Indeed, Dr. Moldauer was selected by counsel for the father, who hoped to obtain from him testimony favorable to the father's case.

Both Dr. Moldauer and Dr. Galler testified unequivocally that M.D., Sr. was not a fit father for M.D., Jr. Each witness provided chapter and verse for his conclusion, basing it in part on the considerable record available as to the father's criminal record and mental health history. Dr. Galler also testified that separation of M.D., Jr. from the foster mother would create a substantial risk of regression and harm to the child, both immediately and in the long term.

There was no appreciable impeachment of either witness by counsel for the father. The judge "cross-examined" both men with considerable skill, but her examination did not significantly challenge their basic conclusions. Moreover, the testimony of Dr. Moldauer and Dr. Galler was consistent with the common sense of the case, for the father was recently convicted of indecent liberties with a minor and he had a long record of criminal activity, emotional disturbance, threatening conduct, homicidal ideation, and attempted suicide. The father, on the other hand, presented no expert testimony to counter that of Dr. Moldauer and Dr. Galler.[18]

█ "[A]s a general proposition, when faced with conflicting expert testimony, the

16. It is worth emphasizing that it is the parent's primary obligation to care for his or her child. According to the expert testimony, this father already blames others for his troubles. We apprehend that excessive focus on what the bureaucracy should or should not have done may tend to legitimize and perpetuate feelings of dependency, encourage the parent to pass the buck, and inhibit the exercise by the parent of personal responsibility and initiative on behalf of the child.

17. The action or inaction of an agency may be relevant in connection with the question whether a father has seized his opportunity interest, *A.C., supra,* 597 A.2d at 925, an issue we do not reach.

It may also be one relevant factor where, with a little more effort by the agency, reunification could be safely and promptly accomplished. *Id.* at 925–26. Given the expert testimony and the father's past conduct, this situation is not presented here.

18. The father relies on a 1990 report by Alden N. Roat, M.D. in connection with the father's admission during that year to Saint Elizabeths Hospital as a result of homicidal ideation. This report discloses that the father admitted recently threatening to hit his sister "when she was hassling him," and that he told Dr. Roat that since then "he has been thinking about killing his two sisters and has felt he might act on this." Dr. Roat

trial court may credit one expert over the other, or disregard both in rendering its judgment." *Rock Creek Plaza–Woodner Ltd. v. District of Columbia,* 466 A.2d 857, 859 (D.C.1983). "[E]ven when uncontradicted, an expert's testimony is not binding on the court." *Id.* (citation omitted). Nevertheless, when a judge rejects expert testimony, "there must be some basis in the record to support the conclusion that [that] evidence ... is unworthy of belief." *Id.* (Citations and internal quotation marks omitted).

■ Where, as here, the expert testimony was unrebutted, we accord only "limited deference" to a trial court judgment rejecting it. *D.C. Transit Systems, Inc. v. Simpkins,* 367 A.2d 107, 109 (D.C.1976). "The fact that an opinion of an expert is in conflict with the opinions of others who are not experts does not deprive it of substance." *Farley v. Heininger,* 70 App.D.C. 200, 205, 105 F.2d 79, 84, *cert. denied,* 308 U.S. 587, 60 S.Ct. 110, 84 L.Ed. 491 (1939). In this case, as in *Medical Service of the District of Columbia v. Llewellyn,* 208 A.2d 734 (D.C.1965),

> we find no proper ground for the use of judicial notice or personal knowledge on the part of the trial judge to challenge or refute the uncontradicted and unimpeached testimony of the [court-appointed] expert[s], [and] we are of the opinion that it could not arbitrarily be disregarded, disbelieved or rejected by [her], and in doing so [s]he committed error.

*Id.* at 736 (footnote omitted).[19]

---

■ The judge also stated, in response to questions from counsel, that it would not be detrimental to M.D., Jr. to remove him from L.L.'s home—a home which the judge found to be a stable one, and in which M.D., Jr. has now lived for more than half his life. Her finding not only amounts to a flat rejection of the very specific expert testimony of Dr. Galler, but is also in some disharmony with applicable decisions of this and other courts. *See, e.g., L.W., supra,* 613 A.2d at 354–55. In *L.W.,* we recognized in a somewhat comparable situation that it would be "ruthless beyond description" to take a child out of a loving home, when she had lived at that home for a substantial period of time as a result of her biological parents' inability or unwillingness to care for her. *Id.* at 355 (quoting *In re Hazuka's Adoption,* 345 Pa. 432, 29 A.2d 88, 90 (1942)). "Time having passed, the fact that [M.D., Jr.] has been living with the prospective adoptive [parent] throughout the trial cannot be ignored since permanence and stability may exist by the time a custody decision is rendered upon remand." *In re Baby Boy C.,* 581 A.2d 1141, 1189–90 n. 17 (D.C.1990) (per curiam) (Rogers, J., concurring) (*Baby Boy C.I*). "[A] stable and desired environment of long standing should not lightly be set aside." *Rutledge v. Harris,* 263 A.2d 256, 257–58 (D.C.1970).[20] In *Bazemore v. Davis,* 394 A.2d 1377 (D.C.1978), we stated that

> at the time of the trial, the child, then over four years old, was living with the father and had been living with him for the previous two and a half years. As to this, the [trial] court significantly noted: "Bouncing this child back and forth between mother and father, paternal and maternal grand-

also referred to M.D., Sr.'s "long history of problems with the law and suicidal behavior," and stated that the father admitted using unlawful drugs. Dr. Roat concluded that the father "is not psychotic and has no significant disorder of his personality." Dr. Roat's diagnosis was "adjustment disorder with mixed emotional features," and he prescribed Thorazine for "agitation."

Dr. Roat did not testify at the trial, and the judge did not refer to his report in her findings. The subject matter of Dr. Roat's report was whether the father should be released from the hospital, and it had nothing to do with his capacity as a parent for a very young child. Read in its entirety, Dr. Roat's evaluation does not pro-

vide any appreciable support for the father's position, nor does it conflict to any meaningful degree with the observations of Dr. Moldauer and Dr. Galler three years later.

**19.** *See also In the Interest of Ashley K.,* 212 Ill. App.3d 849, 156 Ill.Dec. 925, 571 N.E.2d 905 (1st Dist.1991), a case not unlike the present one, in which the court stated that the trial judge "cannot disregard expert medical testimony that is not countervailed by other competent medical testimony or medical evidence." *Id.* 156 Ill.Dec. at 950, 571 N.E.2d at 930.

**20.** *Rutledge* dealt with teenagers, but the point applies with equal force here.

mothers, has not and will not be healthy for her. *Each time she is moved, she gets a scar and who knows whether if ever it will be healed."*

*Id.* at 1380 (emphasis added).

### C. The Statutory Factors.

 We conclude, on the basis of the foregoing discussion, that the trial judge's ultimate findings—namely, that the father is a fit parent and that it is in M.D., Jr.'s best interest to be reunited with him—have been significantly undermined by a misapprehension as to the legal consequences of the indecent liberties conviction, as to the legal significance of the acts and omissions of the agencies, and as to the weight to be accorded to the expert testimony. We must now consider the application to the judge's evidentiary findings of the relevant legal standards.

Our TPR statute sets forth a number of specific criteria which the court must apply in determining the best interests of the child. *See* D.C.Code § 16–2353(b) (1989). We have held that these statutory standards also may logically be applied to adoption proceedings contested by one or both of a child's biological parents. *In re D.R.M.,* 570 A.2d 796, 802–03 (D.C.1990); *L.W., supra,* 613 A.2d at 356 n. 14.[21] Parental rights may be terminated only if the judge finds, by clear and convincing evidence, that termination is in the best interest of the child. *I.B., supra,* 631 A.2d at 1230. The "clear and convincing" standard of proof also applies to a contested adoption. *A.C., supra,* 597 A.2d at 926.

We address the statutory factors in turn.

### (1) The child's need for continuity of care.

Section 16–2353(b)(1) requires the court, in determining whether to terminate parental rights, to consider

the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home. . . .

It is undisputed, and the trial judge found, that M.D., Jr. is fully integrated into L.L.'s stable adoptive home, at which he has lived more than half of his life.

When M.D., Jr. resided with his parents during the first seven months of his life, on the other hand, the situation was unstable, if not chaotic. He was sometimes left by his father in the care of his cocaine-addicted mother, who in turn left him with an unwilling caretaker.[22] Visitation by both parents has since been sporadic. The judge's evidentiary findings lend no support to her apparent conclusion, which we view as a speculative one, that M.D., Jr. could find stability with his father in the foreseeable future.

### (2) The physical, mental and emotional health of all concerned.

Section 16–2353(b)(2) provides that in making the critical "best interests" determination, the judge must consider

the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive considerations being the physical, mental and emotional needs of the child.

The father has not challenged the mental or emotional health of the foster mother or of anyone in her household, and the judge's evidentiary findings in that regard are uniformly favorable to her.

 By contrast, the judge's findings regarding the father's history of emotional disturbance, his criminal record, and his threatening and antisocial behavior establish, at the very least, that the father's emotional health has long been significantly impaired. This unfortunate truth is also borne out by the undisputed testimony of the two court-appointed experts, Dr. Moldauer and Dr. Galler, each of whom testified in some detail regarding the father's "antisocial personality disorder." M.D., Sr., after all, has been convicted of taking indecent liberties with a seven-year-old girl. We are compelled to con-

---

21. We have stated that the somewhat general requirements of the adoption statute, *see* D.C.Code § 16–309(b) (1989) are "not inconsistent" with the more specific requirements of the TPR statute. *L.W., supra,* 613 A.2d at 356 n. 14.

22. Termination of parental rights may be predicated at least in part on a parent's conduct in placing a child with another person who endangers the child's physical or emotional well-being. *Mason v. Dallas County Child Welfare Div.,* 794 S.W.2d 454, 456. (Tex.App.1990).

clude that the judge's ultimate finding that there is "no significant disorder of [the father's] personality" is clearly erroneous in light of the judge's own evidentiary findings. "[O]n the entire evidence [in that regard, we are] left with the definite and firm conviction that a mistake has been committed." *Murphy, supra,* 650 A.2d at 210 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)).

*(3) The quality of the interaction between the child and others.*

Section 16–2353(b)(3) requires the judge to consider

the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative and/or caretakers, including the foster parent.

It is undisputed that M.D., Jr.'s relationship with his foster mother, and apparently with other members of her household, has been altogether favorable. Dr. Galler described

L.L.'s interaction with M.D., Jr. as "very warm."

The judge found that M.D., Jr. has also "bonded" well with his father, but not with his mother.[23] Given the father's sparse visitation record and his mercurial history, however, we do not believe that the record contains any reliable basis for believing that favorable interaction could continue on a long-term basis. Both Dr. Moldauer and Dr. Galler testified that the father lacked the patience and stability required to interact successfully with a 3–year–old boy.[24] Dr. Moldauer, as we have observed, discerned no realistic possibility that this problem could be resolved in the next decade or so. At oral argument before this court, the father's counsel stated that, according to the expert testimony, the average age for men to recover from an antisocial personality disorder is 46. The father is about 33. When he is 46, M.D., Jr. will be 17.[25]

D. *Applicability of Parental Preference.*

The trial judge concluded that M.D., Sr. was entitled to a parental preference because

**23.** We note that the judge explicitly rejected testimony by Dr. Galler which, if credited, cast doubt on the existence of meaningful bonding between father and son.

**24.** Dr. Moldauer noted that M.D., Sr.'s thirteen-year-old son had lived with him, but explained that looking after the younger child would be much more demanding because M.D., Jr. would be far more dependent on the father.

**25.** The court is also required to consider "to the extent feasible, the child's opinion of his or her own best interest in the matter." *See* D.C.Code § 16–2353(b)(4). In light of M.D., Jr.'s tender years, the record contains no information in this regard.

Section 16–2353(b)(3A) deals with "boarder babies" who have been abandoned at the hospital following their birth, and has no relevance to this case.

Section 16–2353(b)(5) requires the court to consider any

"evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided.... Evidence of continued drug activity shall be given great weight."

There has been no showing in this case that services have been provided, and § 16–2353(b)(5) has no direct application. As the mother is married to the father and would presumably live with him and with M.D., Jr. if she

were at liberty and if the father were to obtain custody, her own difficulties must also be considered as part of the "best interests" calculus.

The mother is a cocaine addict. We think it worth noting, in that connection, that drug addiction results, among other things, in significant changes in the chemistry of the brain, which cannot easily be reversed. G.F. UELMEN & V.G. HADDOX, DRUG ABUSE AND THE LAW, § 2.3(a), at 2–13 to 2–14 (1990). Although short-term detoxification may not be difficult, "the problem is that after detoxification—even years after—the ex-addict remains at high risk of relapse." *Id.* at 2–14 (quoting Dr. Avram Goldstein, The Sidney Cohen Lecture (1986)); *see generally Collins v. United States,* 596 A.2d 489, 499–500 (D.C.1991) (dissenting opinion). As one court has recognized in a case in which addicted parents had not used drugs for more than a year, "[that] time frame is negligible when one considers the high rate of recidivism ... and the kind of risk that is involved in putting a child of [five] in the environment that drug addiction breeds." *Ashley K., supra,* 156 Ill.Dec. at 942, 571 N.E.2d at 922. Accordingly, regardless of any intervention or failure to intervene on the part of an appropriate agency, the risk posed to M.D., Jr. by his mother's drug habit (and by his father's exasperation with and intemperate past reaction to her habit) would remain substantial for many years if he were to live with his biological parents. This consideration is not conclusive, but it is a factor which courts surely must consider.

he was a fit parent who had grasped his "opportunity interest." *See Lehr v. Robertson*, 463 U.S. 248, 262, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983). M.D., Jr. and L.L. challenge this finding, both as to the father's fitness and as to the sufficiency of his exercise of his parental rights,[26] and contend that, contrary to the judge's ruling, they proved by clear and convincing evidence that termination of the father's parental rights and adoption by L.L. were both in M.D., Jr.'s best interest.

▮▮▮ Given the judge's evidentiary findings and the uncontradicted expert testimony, her ultimate finding that M.D., Sr. is a fit parent for M.D., Jr., or that he is likely to become fit in the near future, would be difficult to sustain even under the deferential "clearly erroneous" standard. A convicted child molester with a criminal background, homicidal ideation, and a record of threatening conduct is not "fit" in the ordinary everyday sense of that word. But even if we assume, solely for the sake of argument, that M.D., Sr. has not been shown to be unfit, we conclude as a matter of law that the judge's evidentiary findings cannot be reconciled with her implicit conclusion that eventual reunification with the father would be in M.D., Jr.'s best interest.

Unfortunately, in our society, conduct *vis-a-vis* children which in the past might have been viewed as unspeakable has almost become commonplace and unremarkable. As a result of his mother's ingestion of crack cocaine during her pregnancy, M.D., Jr. was brought into this world with that addictive substance already in his system. Predictably, he cried and cried. As if parental transmission of a potential cocaine dependency to a helpless newborn child were not enough, M.D., Sr. acknowledged in open court that he committed a sexual offense against a seven-year-old girl, one who was his own stepdaughter.

This is not all. The parents are married to one another, and may contemplate that their son would live with both of them.[27] He would thus be placed at the tender mercy of a father who, according to the testimony of court-appointed experts, suffers from a severe personality disorder which has led him to threaten people, attempt suicide, commit numerous criminal acts, and blame virtually everyone except himself for his troubles. M.D., Jr. would potentially find himself in the care of a mother who has been indifferent to him, who has prostituted herself (presumably for dope), and who has for some time lived the lifestyle of a cocaine addict.[28]

Nothing in life is certain. It is conceivable, of course, that the experts were wrong, that the trial judge was right, and that notwithstanding the father's indecent liberties conviction, criminal background, and past emotional disturbance, he no longer represents a significant danger to his son's emotional and physical well-being. On this remarkable record, however, it is far more probable that the experts were right, that the past will repeat itself, and that the father's antisocial personality disorder will come to the fore under the pressures of looking after a four-year-old boy (and, possibly, a cocaine-addicted wife). The question is therefore whether the law permits a court to take the kind of risk with M.D., Jr.'s future that reunification with his father would present.

▮▮▮ We hold that the court's first duty is to protect M.D., Jr. from any unwarranted danger of harm. As we recently noted in a similar (but less extreme) factual context, the court, "acting as *parens patriae* in L.W.'s behalf, would surely be loath to take the kind of risk with this child's future which the

---

26. The concept of a parent's "grasping" of his "opportunity interest" has arisen in the context of the claim of an unwed father that he has "demonstrat[ed] a full commitment to the responsibilities of parenthood...." *Lehr, supra,* 463 U.S. at 261, 103 S.Ct. at 2993. In the present case, the father is married to the mother. Because we dispose of this appeal on other grounds, we need not address the applicability of the "opportunity interest" analysis.

27. The mother was incarcerated at the time of trial. She testified that her relationship with the father had been stormy but had improved.

28. The mother testified that she has five children, none of whom has lived with her recently. Asked at trial to give their ages, she was unable to do so.

biological father is asking us to take." *L.W.*, *supra*, 613 A.2d at 354–55. Courts will not "gamble with a child's future." *In re Interest of P.M.C.*, 231 Neb. 701, 437 N.W.2d 786, 792 (1989). On this record, the return of M.D., Jr. to his father would, at the very least, "serious[ly] threat[en] ... the future welfare of the child." *Fritts v. Krugh*, 354 Mich. 97, 92 N.W.2d 604, 614 (1958); *see also In re Sprite*, 155 Mich.App. 531, 400 N.W.2d 320, 323 (1986). Indeed, the possibility that the father would change his past conduct is entirely speculative, especially in light of the testimony of Dr. Moldauer.[29] Where, as here, the child has been successfully integrated into a stable home from which he would now have to be removed if the father were awarded custody, the risk inherent in such an outcome is unacceptable as a matter of law.

### E. The Feasibility of Indefinite Foster Care—The "Wait and See" Option.

■ Our conclusion that early reunification would constitute an unwarranted gamble with M.D., Jr.'s future is not, in and of itself, dispositive of this appeal. Indeed, the question of the child's custody is not technically before us, for the neglect proceedings relating to M.D., Jr. are before a different judge who, according to the trial judge in this case, may hold a view of the situation different from her own. Although here, as in *L.W.*, *supra*, "the only conceivable basis for denying the petition by [L.L.] would be to enable [the] biological father to assume custody," 613 A.2d at 355 n. 10, and although the father's counsel indicated at argument that he will promptly seek the return of his son if the trial court's decision is affirmed, immediate reunification and termination of parental rights are not the only available alternatives. A third option would be to affirm the denial of the petitions, in the expectation that the trial court would seek to bring about more effective action by the social service agencies, and then to "wait and see," in the hope that, contrary to the expert testimony, reunification with the father will become feasible some time in the future.

■ Termination of parental rights is a drastic remedy, which should be ordered only upon a showing of "clear necessity." *See, e.g., In re William L.*, 477 Pa. 322, 383 A.2d 1228, 1241, *cert. denied*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978); *see also In re Adoption of Carlos*, 413 Mass. 339, 596 N.E.2d 1383, 1389 (1992) (characterizing termination as an "extreme step"). Courts are properly expected to exercise restraint before ordering such relief. *William L.*, *supra*, 383 A.2d at 1240–41. We are therefore obliged to consider whether the trial judge's denial of the petitions was an appropriate exercise of that restraint and therefore within her discretion, notwithstanding our disagreement with some of her legal analysis. We are mindful, in that regard, of the fact that M.D., Jr. presently has a father with whom, according to the trial judge, he has "bonded." Adoption of M.D., Jr. by L.L. would deprive the father of any legally protected interest in the boy's future upbringing, and M.D., Jr. would no longer have a legally recognized father. The trial judge's refusal to dissolve permanently the existing legal relationship between father and son is not to be lightly overridden.

Nevertheless, we cannot sustain the "wait and see" option. Legislatures and courts alike have recognized that, in the words of one commentary, "no child can grow emotionally while in limbo. He cannot invest except in a minimal way ... if tomorrow the relationship may be severed." M. Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards*, 27 Stanford L.Rev. 985, 995 (1975) (quoting Bryce & Ehlert, *144 Foster Children*, 50 Child Welfare 499, 503 (1971)). In *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), the Supreme Court recognized that "protracted stays in [foster] care ... may deprive [neglected] children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens." *Id.* at 835–36 n. 37, 97 S.Ct. at

---

**29.** To the extent, if any, that the father's limitations as a parent for M.D., Jr. can be laid at the door of the bureaucracy, there is no assurance that overworked and understaffed agencies can do better in the future.

2105 n. 37 (quoting legislative finding). Legislation on the federal and local levels has been enacted to counteract the dangers inherent in the consignment of neglected children for an indefinite period to temporary expedients such as foster care.

 The federal Adoption Assistance and Child Welfare Act of 1986 (AACWA), 42 U.S.C. §§ 670, et seq., requires affected jurisdictions to "facilitate permanent placement for children as a condition to receiving federal funding for their foster care and adoption assistance programs." "[T]he central purpose of the legislation is to remove children from long term foster care, either by uniting them with their parents or by placing them with adoptive parents or in some other permanent arrangement." Ashley K., supra note 19, 156 Ill.Dec. at 938, 571 N.E.2d at 918. "Foster care, with few exceptions, should be a temporary placement." Id. (quoting Senator Cranston's remarks in introducing the bill, 125 Cong.Rec. S22684 (Aug. 3, 1979)); see also In re Adoption No. 10941, 335 Md. 99, 642 A.2d 201, 204 (1994).[30] The District of Columbia receives federal financial assistance pursuant to the AACWA, see LaShawn A. v. Dixon, 762 F.Supp. 959, 962–64 (D.D.C.1991), aff'd sub nom. LaShawn A. v. Kelly, 301 U.S.App.D.C. 49, 990 F.2d 1319 (1993), cert. denied, —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 659 (1994), and is obliged to comply with its mandates. The District has also enacted legislation requiring prompt planning for the permanent placement of a child who has not been reunited with his or her family within a reasonable time. See D.C.Code §§ 6–2123(b)(2); 16–2360(b); LaShawn A., supra, 762 F.Supp. at 964; see also In re A.W., 569 A.2d 168, 172–73 (D.C.1990) (discussing legislative history of TPR statute).[31]

"Almost everyone agrees that a child should not be suspended permanently in fos-

ter care . . ." if any other solution is possible. 3 DONALD T. KRAMER, LEGAL RIGHTS OF CHILDREN, § 29.10, at 77 (2d ed. 1994). If a child is adoptable, then adoption is the statutorily preferred plan, for the goal of permanency planning "is to end the uncertainty of foster care and allow the dependent child to form a long-lasting emotional attachment to a permanent caretaker." In re Brian R., 2 Cal. App.4th 904, 3 Cal.Rptr.2d 768, 778 (6th Dist. 1991) (citations omitted). "A child cannot, and should not, be left suspended in foster care, nor be made to await uncertain parental maturity." In re Interest of J.W., 224 Neb. 897, 402 N.W.2d 671, 676 (1987); see also P.M.C., supra, 437 N.W.2d at 792. In the present case, according to the expert testimony, the improvement of the father's condition to the point where he could safely look after M.D., Jr., is not only uncertain but, for the foreseeable future, extremely improbable. "Although we sincerely hope that [the father] one day finds mental and emotional stability, we cannot leave [M.D., Jr.] in legal limbo waiting for an event that likely will never happen." In re Adoption No. 10941, supra, 642 A.2d at 211.

The recent decision of the Court of Appeals of Maryland in Adoption No. 10941 is instructive. There, the maternal grandparents of Ivan M., who was born in June, 1990, and who had lived with them since birth, filed a petition to adopt him. The Department of Social Services filed a companion petition to terminate Ivan's mother's parental rights.[32] The mother, who was mentally retarded and schizophrenic, opposed the petition and sought to obtain custody of Ivan. The trial judge found that it was in Ivan M's interest to remain in the custody of his grandparents, but held that his continued placement with them did not require termination of the mother's parental rights. He reasoned that "the [c]hild is presently in a stable environment with his grandparents, and this envi-

---

**30.** The Maryland Court of Appeals has described the phenomenon as "foster care drift." In re Adoption No. 10941, supra, 642 A.2d at 204. This court has used the phrase "endless rootlessness." E.C. v. District of Columbia, 589 A.2d 1245, 1251 (D.C.1991).

**31.** "[T]he sooner a child is freed for purposes of an adoptive placement, the sooner he or she will

finally obtain an environment of permanence and continuity of relationships." A.W., supra, 569 A.2d at 172 (quoting the Judiciary Committee's Report on the TPR legislation).

**32.** Ivan M.'s father, an alien who had been convicted of rape, was deported and played no part in the litigation.

ronment provides him with the security and sense of belonging to a family that is the goal of adoption." *In re Adoption No. 10941, supra,* 642 A.2d at 211 (quoting the trial court's order).

The Court of Appeals reversed, holding that "[o]nly termination of parental rights and a subsequent permanent placement, such as the adoption sought by the grandparents here, can provide Ivan with the permanency he needs and the Legislature has mandated." *Id.* at 212. The court explained that it was necessary to approve the grandparents' petition to adopt because, so long as Ivan has not been adopted, he

> remains within the foster care system, and thereby subject to administrative review every six months. He also remains under the jurisdiction of the juvenile court, subject to periodic judicial review. This constant administrative and judicial supervision is disruptive to the lives of Ivan and his grandparents, and is the very type of uncertainty the child welfare statutes were designed to avoid. Also, as Ivan's natural guardian, [the mother] has the right to visitation and the right to make educational and medical decisions on his behalf. [Statutory citation omitted.] More importantly, while the grandparents have expressed their unequivocal desire to adopt Ivan, if they are not his legal parents, they can later decide, for whatever reason, that they are no longer in a position to care for Ivan. If this were to occur, the grandparents would simply inform the juvenile court that retains jurisdiction over Ivan that they can no longer care for him and the court would have no alternative but to place him back in the foster care system. This possible "foster care drift" is exactly

what Congress and our General Assembly desire to avoid.

*Id.* at 212.

■ These considerations apply with at least equal force to M.D., Jr.'s situation.[33] *See also In re Adoption of Gwendolyn,* 29 Mass.App. 130, 558 N.E.2d 10, 14 (1990). If the decision in this case were to "wait and see," then for how long should the trial court do so? M.D., Jr. has already lived with the foster mother for three years. May permanency for M.D., Jr. be deferred for two more years? Five years? Even ten more, according to Dr. Moldauer, would not be enough to make a placement with the father feasible. We conclude, as a matter of law, that on these facts, the "wait and see" alternative cannot be reconciled with M.D., Jr.'s best interests or with the authorities which we have cited.[34]

### F. Directions on Remand.

■ Where a judge, in exercising her discretion, has in our view misapprehended applicable legal principles, we often remand the case for reconsideration under the correct standards. *See, e.g., Murphy v. McCloud, supra,* 650 A.2d at 220. In the present case, in light of the clear weight of the evidence and the danger to the child, however, we are of the opinion that such a remand would serve no useful purpose.

We recognize that appellants had the burden to prove their case by clear and convincing evidence. An appellate court will rarely hold as a matter of law, notwithstanding the contrary view of the trial judge, that a party's proof satisfied such an exacting standard. In the vast majority of cases, that determination must be made by the trier of fact. We conclude, however, that this is one of the rare cases in which such an appellate

---

**33.** The Maryland Court of Appeals relied in its decision both on federal and local law. While District of Columbia law is not identical to Maryland law in this regard, its basic purpose is substantially the same. *See LaShawn A., supra,* 762 F.Supp. at 962–64 (describing statutory and regulatory scheme) and discussion in text at p. 888, *supra.*

**34.** We agree with the Supreme Judicial Court of Massachusetts that termination of parental rights

might well be inappropriate where "there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary." *In re Adoption of Carlos, supra,* 596 N.E.2d at 1389. For the reasons we have stated, however, we conclude that no reasonable likelihood that reunification will soon be in M.D., Jr.'s best interest can fairly be gleaned from the record in this case.

ruling is appropriate. Indeed, the law requires us so to hold in the interest of M.D., Jr.[35]

Like all mortals, M.D., Sr. has both strengths and weaknesses. One may well regard as admirable his fight to keep his son, which he has waged, in the trial judge's words, "against the odds." Moreover, termination of parental rights, as we have noted, is an extreme remedy. Nevertheless, the best interests of this child cannot be disregarded in order to reward the father for his efforts or to encourage others to exercise their parental responsibilities. M.D., Jr. is the subject of this litigation. What is best for him trumps all other considerations.

## III.

## CONCLUSION

For the foregoing reasons, the decision of the trial court is reversed and the case is remanded with directions to grant M.D., Jr.'s motion to terminate his father's parental rights and L.L.'s petition to adopt M.D., Jr.

*So ordered.*[36]

**35.** Our statute authorizes termination of parental rights if "the judge," defined as a judge of the Family Division of the Superior Court, D.C.Code § 16–2301(2)—finds termination to be in the interests of the child. *Id.* § 16–2352(b). The practical effect of our decision is to direct the trial court to enter such a finding.

**36.** Appellants have moved the court to supplement the record, alleging that events since the trial support their position. *Cf. In re M.F.,* 644 A.2d 1363, 1366 n. 6 (D.C.1994); *In re D.G.,* 583 A.2d 160, 168–69 (D.C.1990). In light of our disposition in appellant's favor on the original record, we deny the motion as moot.