# District of Columbia
# Court of Appeals

**Nos. 15-FS-662, 15-FS-720 & 15-FS-721**

IN RE: M.V.H.;

        M.V.H.,

                        Appellant,

  & 

IN RE M.V.H.;                                  **ADA-81-12 & ADA-20-13**

        L.H.,

                        Appellant,

  & 

IN RE L.F.G.;

        L.H.,

                        Appellant.

On Appeal from the Superior Court
of the District of Columbia

BEFORE: GLICKMAN and THOMPSON, *Associate Judges*; and REID, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the trial court is affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: July 21, 2016.

Opinion by Associate Judge Phyllis D. Thompson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 15-FS-662, 15-FS-720 & 15-FS-721

FILED 7/21/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

IN RE M.V.H.; M.V.H., APPELLANT,

IN RE M.V.H.; L.H., APPELLANT,

IN RE L.F.G.; L.H., APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(ADA-81-12 & ADA-20-13)

(Hon. Anthony C. Epstein, Trial Judge)

(Argued May 17, 2016                                  Decided July 21, 2016)

*Leslie J. Susskind* for appellant M.V.H.

*Carla S. Rappaport* for appellant L.H.

*Lucy Vera Osakwe* for appellee L.F.G.

*Rhondalyn Primes Okoroma*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for the District of Columbia.

*Jessie Forsythe*, with whom *Melissa Colangelo*, and *Abraham Sisson*, were on the brief, for guardian ad litem Children's Law Center.

Before GLICKMAN and THOMPSON, *Associate Judges*, and REID, *Senior Judge*.

THOMPSON, *Associate Judge*: L.H. (the biological mother of the child A.H.) and M.V.H. (A.H.'s maternal grandmother) appeal the Superior Court order granting the adoption petition of L.F.G. (A.H.'s foster mother) and denying M.V.H.'s competing petition, to which L.H consented. We affirm.

## I.

A.H. was born on February 19, 2010. For the first year of her life, she lived with L.H. in M.V.H.'s home, along with L.H.'s minor son (A.H.'s brother), L.H.'s sister M.H., and M.H.'s two minor children. On October 28, 2010, A.H. was taken to the hospital with a left femur fracture and a tibia fracture, injuries that L.H. could not explain and that the hospital physician suspected were the result of abuse. After A.H. was treated and released, the District of Columbia Child and Family Services Agency ("CFSA") entered into a safety contract with L.H. requiring, *inter alia*, that L.H. take A.H. to the hospital immediately if she appeared to be in pain. Approximately four months later, on March 1, 2011, A.H. was again brought to the hospital, this time with a right femur fracture, a left tibia

fracture, a left humerus fracture, a right radial fracture, and facial bruising.[1]  Dr. Tanya Hinds, the treating pediatrician, concluded that the injuries had occurred at different times over the previous approximately four weeks and that the femur fracture would have caused "a lot of distress" to a child of A.H.'s age.  Dr. Hinds also concluded, "with a reasonable degree of medical certainty[,]" that A.H. had suffered child abuse on more than one occasion.

A.H. was removed from L.H.'s care on March 1, 2011, and was placed with L.F.G. on April 5, 2011.  On November 9, 2011, after a multi-day hearing, Magistrate Judge Errol R. Arthur sustained the government's allegation that A.H. had been physically abused and adjudged A.H. to be a neglected child pursuant to D.C. Code § 16-2301 (9)(A)(i), (ii).  He initially set a permanency goal of reunification of A.H. with L.H. but, on April 30, 2012, changed the permanency goal to adoption.  On May 12, 2012, L.F.G. filed a petition to adopt A.H.  M.V.H. filed a competing adoption petition on February 8, 2013, to which L.H. formally consented on March 27, 2014.  Over twenty-six days, from February through December 2014, Magistrate Judge Arthur held a trial on the competing adoption

---

[1]  Tests showed that A.H.'s bones were normal and healthy except for the fractures she suffered.

petitions. On December 17, 2014, the magistrate judge, ruling from the bench, granted L.F.G.'s (amended) adoption petition. On March 16, 2015, he issued written findings of fact and conclusions of law.

In his written ruling, Magistrate Judge Arthur stated that he gave "weighty consideration" to L.H.'s preferred caregiver, M.V.H., but nevertheless found that L.F.G. had established by clear and convincing evidence that M.V.H. is not fit to care for A.H., and that, "even if found fit, adoption of [A.H.] by [L.H.'s] preferred custodian, M.V.H., and placement in M.V.H.'s home, is clearly contrary to . . . [A.H.'s] best interests." He further found "clear and convincing [evidence] that L.F.G. is fit and proper to adopt [A.H.]" He determined that A.H.'s biological parents "withh[eld] consent to the adoption petition filed by . . . L.F.G., contrary to [A.H.'s] best interests, and thus their consents shall be waived."[2]

---

[2] The judge also found that A.H.'s biological father, I.J., had abandoned A.H., and that his consent therefore was not required. I.J. has taken no part in this appeal.

M.V.H. and L.H. each filed a motion for review. On May 21, 2015, the Honorable Anthony C. Epstein denied their motions. These appeals by L.H. and M.V.H. followed.

In her brief on appeal, M.V.H. argues that the finding that she is unfit to parent A.H. lacked a firm factual basis and that the magistrate judge failed to give weighty consideration to her as L.H.'s preferred caregiver. L.H. argues that the evidence did not support the trial court's finding that she was withholding her consent to adoption by L.F.G. contrary to A.H.'s best interests. She also argues that the magistrate judge erred in failing to acknowledge and apply the presumption that placement with a natural parent is in the child's best interest and to make explicit findings regarding L.H.'s fitness. In addition, both appellants contend that the Superior Court order must be reversed because CFSA "unreasonably refused to engage in reunification planning and services[.]"

**II.**

This court's "role is to review the ruling of the associate judge, in which it reviewed the magistrate judge's order for errors of law, abuse of discretion, and clear lack of evidentiary support[,]" but "we are not limited to the associate judge's ruling and may review the trial court [action] as a whole, looking to the findings and conclusions of the fact finder on which that ruling is based." *In re J.J.*, 111 A.3d 1038, 1043 (D.C. 2015) (internal quotation marks and brackets omitted). "We review the trial court's legal determinations *de novo* and its findings of fact under a clearly erroneous standard." *In re B.J.*, 917 A.2d 86, 88 (D.C. 2007) (quoting *In re A.C.G.*, 894 A.2d 436, 439 (D.C. 2006)).

## III.

We turn first to the argument that there is no firm factual basis in the record for the magistrate judge's finding that M.V.H. is unfit to adopt A.H. We disagree. To be sure, Magistrate Judge Arthur specifically acknowledged the evidence of M.V.H.'s stable living arrangement and employment, her lack of mental health issues, her love for her family, and her good interaction with her grandchildren. However, an individual is unfit to parent a particular child if "placement of the child [with that individual] would endanger the child[.]" *In re S.L.G.*, 110 A.3d

1275, 1287 (D.C. 2015). That is what the record in this case established with respect to M.V.H. and A.H. The evidence established that A.H. was injured, repeatedly, while at or residing in M.V.H.'s home. Magistrate Judge Arthur did not find "credible or believable" M.V.H.'s testimony that A.H. was injured in a fall from her stroller or by her cousin's bicycle.[3] His finding was supported by Dr. Hinds's testimony that the incidents as described by M.V.H. could not have been the cause of all of the injuries A.H. sustained. Magistrate Judge Arthur also heard the testimony of psychologist Dr. Seth King, who evaluated the parenting capacity of M.V.H. and who told the court that M.V.H. lacked insight into the degree of suffering A.H. had endured and expressed no concern about the fact that A.H.'s injuries remain unexplained or about A.H.'s safety. This lack of concern was notwithstanding evidence that M.V.H.'s household composition remained largely

---

[3] M.V.H. testified that the injuries with which A.H. presented in October 2010 occurred when A.H.'s brother ran through the room, knocking over the stroller in which A.H. was sitting and falling on top of her. M.V.H. acknowledged that she did not seek medical attention for A.H. immediately after that incident. Regarding A.H.'s March 2011 injuries, M.V.H. testified that she and others were outside when A.H.'s cousin ran over A.H. on his bicycle. M.V.H. explained that she did not seek medical attention for A.H. because "[A.H.'s] mother was right there."

the same as when A.H. was injured (meaning that the perpetrator may still be present in the home).[4]

Given the foregoing credibility determinations and testimony, we are satisfied that the magistrate judge had a firm factual foundation for finding that M.V.H. was unfit to become A.H.'s adoptive parent and that placing A.H. with M.V.H. would be clearly contrary to A.H.'s best interests. The evidence did not show unequivocally that M.V.H. knew who had abused A.H. or that M.V.H. was protecting the perpetrator, but it indicated clearly and convincingly that M.V.H. showed little concern about, and demonstrated a lack of commitment to, protecting A.H. from danger.[5] That is an indicator of unfitness to parent. *See In re S.L.G.*,

---

[4] Social worker Kaplan explained to the court that she was not allowed to go into M.V.H.'s or M.H.'s bedrooms in the home to see whether other people (possible perpetrators) were present in the home and to complete a safety inspection, and that L.H. was not forthcoming about any boyfriends (of M.H.) or others who might have frequented the home.

[5] "Clear and convincing evidence is evidence 'which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.'" *In re K.D.*, 26 A.3d 772, 778 (D.C. 2011) (quoting *In re W.E.T.*, 793 A.2d 471, 478 (D.C. 2002)). However, "'clear and convincing' does not mean 'clear and unequivocal.'" *Id.* (quoting *In re W.E.T.*, 793 A.2d at 478).

110 A.3d at 1287 ("Unfitness may be evidenced by . . . the inability or unwillingness . . . to provide a safe . . . home for the child[.]").

Magistrate Judge Arthur explicitly acknowledged that, in this competing adoption case where L.H. consented to M.V.H.'s petition, he was required to "give[] weighty consideration to the [birth mother's] choice of a caretaker, M.V.H." The birth parent's choice of custodian can be overcome, however, "by a showing, by clear and convincing evidence, that the custodial arrangement . . . is clearly contrary to the child's best interest." *In re T.J.*, 666 A.2d 1, 11 (D.C. 1995). And, in considering the child's best interest, "the court's first duty is to protect [the child] from any unwarranted danger of harm." *In re L.L.*, 653 A.2d 873, 886 (D.C. 1995). Accordingly, Magistrate Judge Arthur was not required to ignore the evidence that no adequate explanation had been provided for A.H.'s repeated injuries at M.V.H.'s home (or the evidence that the injuries "immediately stopped when [A.H.] no longer lived in the same home" as M.V.H.); the "high risk" that placing A.H. with M.V.H. would again expose A.H. to the perpetrator of abuse; M.V.H.'s failure either to notice A.H.'s suffering or to seek prompt medical attention for A.H. after she sustained her various injuries; and M.V.H.'s failure to attend any of A.H.'s medical appointments. (Magistrate Judge Arthur found incredible M.V.H.'s testimony that she was neither aware that she was permitted to

attend nor informed of the appointments). M.V.H.'s failure to attend medical appointments was of particular significance in light of the evidence presented that A.H. faces years of surgeries, daily treatment, and physical therapy, procedures in which her caretaker will play an important role.[6] The court heard evidence that A.H.'s adoptive parent would need to have "a detailed understanding of what [the] specific needs are of the child[] so that she could advocate for the child receiving the appropriate treatment." Yet, not only did M.V.H. attend none of A.H.'s medical appointments, but also, as an explanation for A.H.'s injuries, she continued to assert that A.H. suffered from an orthopedic condition that doctors had ruled out. The magistrate judge reasonably concluded that M.V.H.'s lack of engagement with A.H.'s medical needs "negate[d] her fitness and commitment to understand [A.H.'s] needs."

---

[6]    The evidence at trial established that, because the injuries A.H. suffered damaged the growth plate in one of her legs, she will require extensive medical care to ensure one leg is not significantly shorter than the other. This will include at least two bone-lengthening procedures, each of which requires surgery to affix the frame to the bone; one or two days' hospitalization; and, for the following four to six months, daily cleaning and turning the external screw, as well as physical therapy. The court heard testimony that when a young child undergoes this procedure, it is "totally up to the caregiver . . . to manage the [apparatus] and to be aware of the potential complications" and seek assistance from the hospital if necessary.

On a record showing that placement of A.H. with M.V.H. "m[ight] expose her to the perpetrator of abuse, and endanger her medical health, "the risk inherent in such an outcome is unacceptable as a matter of law." *In re L.L.*, 653 A.2d at 887.[7] Therefore, notwithstanding the weighty consideration the magistrate judge was required to accord to M.V.H. under our case law, he did not abuse his discretion in concluding that placement with M.V.H. is clearly contrary to A.H.'s best interest.[8]

Further, the record supports the trial court's determination that L.H. withheld her consent to A.H.'s adoption by L.F.G. contrary to A.H.'s best interest.[9] The

---

[7] Although the circumstances which led to A.H.'s removal from L.H. while they lived with M.V.H. may have changed, and while M.V.H. possibly could become a capable caregiver for A.H., on the record that was before the trial court, "th[at] possibility . . . [was] entirely speculative[.]" *In re L.L.*, 653 A.2d at 887; *see also In re J.G.*, 831 A.2d 992, 1002 (D.C. 2003) ("[A]lthough several years had passed since the unconscionable treatment of [the child] . . . , the judge was obligated to include in his calculus the possibility that such conduct could recur."). "Courts will not gamble with a child's future." *In re L.L.*, 653 A.2d at 887 (internal quotation marks omitted).

[8] *See In re K.D.*, 26 A.3d at 781 n.9 (noting that best interests of the child determinations are guided by D.C. Code § 16-2353 (b), which mandates *inter alia* a consideration of the "physical . . . needs of the child," § 2353 (b)(2)).

[9] Appellants do not dispute that the record supports the trial court's finding that L.F.G. is fit to adopt A.H. The evidence established that L.F.G. has ensured that A.H.'s needs are met; she sought out physicians, made and attended A.H.'s

(continued…)

evidence showed that A.H. has been with L.F.G. for all but the first year of her life, and, according to Dr. King, who evaluated A.H.'s relationship with L.F.G., the two have a "very close" relationship. Dr. King testified that A.H. views L.F.G. as her primary attachment figure and caregiver, "[t]he person she relies on" and "[a] source of comfort and soothing[.]" He provided uncontroverted testimony that removing A.H. from L.F.G.'s care may, in the short term, cause A.H. stress, trauma, "mental health symptoms, emotional symptoms, emotional distress[,] [b]ehavioral problems,[and] [developmental] regression"; and that, in the long term, A.H. may face emotional issues, depression, anxiety, substance abuse problems, conduct problems, involvement in the juvenile justice system, and interpersonal problems such as withdrawing and not wanting to form relationships with others.[10] The record thus supports a conclusion that "it would be 'ruthless

_____

(…continued)
orthopedic appointments, and provided comfort and care throughout procedures. She enrolled A.H. in daycare and has participated in educational activities with her, provided a safe and loving home, and provided opportunities for A.H.'s biological family to participate in A.H.'s life (which A.H.'s biological family declined).

[10] Dr. King testified that, although therapeutic measures could be taken to address potential issues A.H. would face in a transition to M.V.H.'s home, the effectiveness of the services would depend on the participation level of the caregiver, the length of time participating in services, and consistency in therapy. He testified that, if M.V.H. participated in a training to learn how to assist A.H. in transitioning, she would be "capable of understanding[.]" However, according to his assessment, M.V.H. "minimize[d] the impact of taking a child away" from her primary caregiver and "[u]ndermine[d] the seriousness and any challenges that

(continued…)

beyond description' to take [A.H.] out of [her] loving home" with L.F.G., where she has lived for a substantial period of time as a result of L.H.'s failure to protect her from harm. *In re L.L.*, 653 A.2d at 883 (quoting *In re L.W.*, 613 A.2d 350, 355 (D.C. 1992)).

L.H. further argues that the magistrate judge "did not apply the presumption that custody with a natural parent is in the child's best interest, provided the parent is not proven unfit."[11] We have repeatedly recognized a "parental presumption,"[12]

_____

(…continued)

would come up[.]" He further testified that, even with therapeutic services, a child may still experience attachment disturbance issues. In addition, in light of A.H.'s unexplained injuries, he highlighted the possibility that she will again be exposed to the perpetrator or circumstances that led to injury, "which could retrigger any issues of trauma and symptoms of trauma which can be long-standing."

[11] L.H. also argues that the trial court improperly based its decision on a finding that L.F.G. is "fitter." We reject this argument. Because the court was required to consider the statutory factors with respect to "all individuals involved to the degree that such affects the welfare of the child," D.C. Code § 16-2352 (b)(2)), it was required to assess L.F.G. But nowhere in the court's analysis was there any finding to the effect that, while M.V.H. (or L.H.) can provide a safe home for A.H. and attend adequately to her medical needs, L.F.G. can provide a better home and can do a better job. Rather, the magistrate judge found that M.V.H. could not provide A.H. with a safe home and the medical attention she needs, while L.F.G. can do so and has done so.

[12] The presumption gives effect to the constitutional protection afforded to parents to "establish a home and bring up children, to direct the upbringing and education of children, and to direct the care, custody, and management of their

(continued…)

and we have held that, in a case where the biological parent seeks to retain parental rights or regain custody, this presumption "is rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." *In re S.L.G.*, 110 A.3d at 1286 (internal quotation marks omitted). We have said that the trial court must "correctly and explicitly incorporate the parental presumption into its analysis[,]" and make either an explicit finding of parental fitness or "equivalent findings." *Id.* at 1289-90.

That said, our "explicit or equivalent finding of birth parent unfitness" case law has developed in the context of biological parents' demands to retain parental rights; we have not extended the holdings of these cases to adoption proceedings in which the birth parent does not seek to retain parental rights and custody of the child, but instead has formally consented to adoption by a preferred caregiver. That is the case here: Magistrate Judge Arthur had before him L.H.'s statement supporting M.V.H.'s petition to adopt A.H., in which L.H. stated, "[T]he best interests of [A.H.] and myself will be served by M.V.H.'s adoption of [A.H.][,]" as

---

(…continued)
child[.]" *In re D.S.*, 88 A.3d 678, 686 (D.C. 2012) (internal citations and quotation marks omitted).

well as L.H.'s submission in response to M.V.H.'s (later withdrawn) complaint for custody, in which L.H. stated her "desire that [M.V.H.] be awarded sole legal and physical custody of [A.H.]"[13] On a record such as this, the trial court's omission of an analysis of the birth parent's fitness arguably does not contravene the "fundamental and constitutionally protected liberty interest that natural parents have in the care, custody, and management of their children." *In re S.L.G.*, 110 A.3d at 1286.

We need not decide that issue here, however, because we are satisfied that L.H. waived or forfeited her right to a determination about her fitness to parent A.H. During cross examination of L.H., L.H.'s counsel objected to questions

---

[13] Additionally, social worker Kaplan testified that L.H. told her that her "wish[] towards permanency" was placement of A.H. with M.V.H. We recognize that L.H. responded in the affirmative when asked if she was "asking the Court today to return A.[H.] to [her] care and custody[.]" Also, when asked, "So you're not asking the Court to return the child to your care?" L.H. answered, "[I]f I can't get her back in my care, then yes, I would agree for my mom to get her, yes." And when counsel for the District of Columbia asked, "So you're not asking the Court to return the child to you at this time?" L.H. replied, "I've never said that." During closing arguments, however, reminding the court that L.H. had "displayed her willingness to not only parent A.H. . . . [,] but [also her] interest in reunifying with A.H.," L.H.'s counsel relied on those remarks not to urge the court to return L.H. to her care and custody, but to argue that L.H. was competent to exercise her parental choice, and to urge the court to "honor[] the parent's choice" of preferred custodian.

about L.H.'s suitability as a parent as "beyond the scope," on the ground that L.H. had consented to M.V.H.'s adoption petition (and Magistrate Judge Arthur sustained the objection). Further, in her motion for review by the associate judge, L.H. did not request custody of A.H., but rather requested that the court order the magistrate judge to grant M.V.H.'s adoption petition. Likewise on appeal, L.H. has not asked that A.H. be returned to her care and custody.[14]

Finally, appellants argue that CFSA "refused to provide reunification services, recommending a premature change of goal instead, [which] interfer[ed] with the mother's opportunity to resume custody of her child[,]" and that the trial court erred in "fail[ing] to consider the agency's inaction to reintegrate the

---

[14] We note, moreover, that even if a finding of L.H.'s fitness to parent A.H. had been required, we see no reason why the same considerations of child endangerment discussed above with respect to M.V.H. would not also apply to A.H. As Judge Epstein put it, "the reasons why [Magistrate Judge Arthur] found M.V.H. to be unfit apply equally, if not more strongly, to [L.H.]" Magistrate Judge Arthur noted L.H.'s "inconsistent involvement in [A.H.'s] treatment," having heard testimony that L.H. failed to seek timely medical attention for A.H. during the course of her prolonged abuse over several months, missed multiple medical appointments for A.H. (including at least two of A.H.'s post-goal change orthopedic appointments), and never asked any questions at the appointments she did attend, despite the opportunity to do so. Further, the social worker expressed concern regarding L.H.'s "passivity" about A.H.'s injuries and regarding L.H.'s "ability to speak up for A.H. in the event she [had] to protect A.H."

family[.]"[15] While we recognize that agency action (or inaction) that creates a premature presumption in favor of adoption may be problematic, *see In re D.R.M.*, 570 A.2d 796, 807 (D.C. 1990), the record here does not support appellants' complaint. Social worker Kaplan, to whom A.H.'s case was assigned while the permanency goal was reunification, testified that it is important for social workers to know the circumstances surrounding a child's injuries because the circumstances inform what services the agency will offer to mitigate the reasons the child came into care. However, according to Kaplan, L.H. denied any domestic violence, supervisory, physical abuse, or substance abuse issue, and "continuously denied the need for the services." For that reason, CFSA was unable to direct L.H. to a domestic violence support group, an anger management class, alternative housing, or other appropriate service. Kaplan testified that she recommended a goal change to adoption because it was not clear that the reasons A.H. had come

---

[15] M.V.H also argues the trial court erred in "ignor[ing] that M.V.H. requested and was denied her own visits with A.[H.]" But the court heard Kaplan's testimony that because of A.H.'s unexplained injuries at M.V.H.'s home, CFSA "couldn't safely allow A.H. to be left alone unsupervised with M.V.H." Further, even assuming *arguendo* that the court erred by failing to fully consider M.V.H.'s lack of opportunity to visit more with A.H., we are satisfied that the error was harmless in light of the evidence, discussed above, that raised grave doubt about M.V.H.'s ability to protect A.H. and meet her medical needs.

Further, even if we were to find a failure in CFSA's actions, adoption "is not precluded solely because the custodial agency has failed in its responsibility to make efforts to reunify the family." *In re A.C.*, 597 A.2d 920, 926 (D.C. 1991).

into foster care had been alleviated, and because CFSA was unable to "state that A.H. could safely return to L.H. without trying to fix or eradicate any of the risk factors that led to A.H. coming into care."[16] In light of Kaplan's undisputed testimony, we are not persuaded by L.H.'s argument that the "agency's approach was not reasonable."[17]

---

[16] Notably, the court, which changed the permanency goal to adoption in April 2012, did not immediately accept the CFSA goal-change recommendation. In February 2012, Kaplan had recommended that the permanency goal be changed to adoption, but the court directed her to follow up with L.H. again about the causes of A.H.'s injuries. Kaplan testified that she made follow-up inquiries on at least three occasions, but received no explanation about how A.H. sustained her injuries.

[17] L.H. also asserts that, if "[the social worker] believed [L.]H. was lying or irrationally refusing to recognize [A.H.] had been abused[,]" the "next logical step" would be to provide services to help L.H. overcome her belief that A.H. was not subjected to abuse. Yet the record contains no indication that L.H. sought these services.

To the extent that L.H. also challenges that the permanency goal was changed without an evidentiary hearing, it does not appear from the record, that she sought an evidentiary hearing (although she might have done so, *see* Super. Ct. Neg. R. 28 (a), 30 (c)).

**IV.**

For the foregoing reasons, the judgment of the Superior Court is hereby

*Affirmed.*