*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-FS-892

IN RE H.C.; K.C., APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(NEG-490-15)

(Hon. Rahkel Bouchet, Magistrate Judge)
(Hon. Robert Okun, Associate Judge)

(Argued February 15, 2018                    Decided  July 5, 2018)

*Thomas C. Devlin* for appellant.

*Rhondalyn Primes Okoroma*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Stacy L. Anderson*, Senior Assistant Attorney General, were on the brief, for appellee.

Before GLICKMAN and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

GLICKMAN, *Associate Judge*:  This is a mother's appeal from an order changing her neglected child's permanency goal to adoption.  The decision was made after an evidentiary hearing, as required by *In re Ta.L.*, 149 A.3d 1060 (D.C. 2016) (en banc).  The Magistrate Judge found that the mother's intellectual disability and mental health needs rendered her incapable of properly caring for the

child, even with the parental training and other assistance she had been receiving and despite the government's reasonable efforts for over a year to help her ameliorate the conditions that led to her child's removal and achieve a safe reunification. An Associate Judge of the Superior Court reviewed and affirmed the Magistrate Judge's findings and conclusions.

On appeal to this court, the mother does not dispute her impaired ability to parent her child, and she finds no fault or insufficiency with the constellation of services provided to help her overcome that obstacle to reunification. She contends, however, that in changing her child's permanency goal to adoption despite the availability of those services, the Superior Court violated her rights under federal law – the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 – to reasonable accommodations of her intellectual disability that would enable her to parent the child.

We disagree with this contention. The ADA and the Rehabilitation Act do protect parents with disabilities, including intellectual and psychiatric disabilities, from discriminatory curtailment of their parental rights. The statutes require the provision of reasonable accommodations in order to afford such parents the same opportunities as other parents have to achieve family reunification. But where, as

in this case, the evidence supports a finding that a mentally impaired parent poses a significant risk to a child's health and safety that cannot be eliminated by reasonable accommodations, the ADA and the Rehabilitation Act permit the court to decide against pursuing reunification and in favor of a permanency goal of adoption or another suitable placement in the child's best interest. We therefore affirm the order on appeal.

**I.**

Appellant K.C. gave birth to H.C., the child respondent in this appeal, on December 14, 2015. H.C.'s father is unknown; K.C. has been unable to identify him. Because H.C. was at risk of having contracted a life-threatening disease from her mother in utero, she was prescribed an antiretroviral medication when she was born. This medication would need to be given to H.C. once every twelve hours for three to six months after she went home from the hospital.

H.C. remained in the hospital for several days following her birth. During that time, the Child and Family Services Agency ("CFSA") received a hotline report from a caller at the hospital expressing concern that K.C. would be unable to care for H.C. The caller advised that K.C. had been diagnosed with psychiatric disorders (Major Depressive Disorder with psychotic features and Post-Traumatic

Stress Disorder) and intellectual disability, and that she received services from the Department of Disability Services ("DDS") and resided in a supportive housing program run by Frontline Community Services ("Frontline"). The caller also mentioned that K.C. had a history with CFSA that included the removal of her several prior children.

Herbert Carr, a CFSA investigative social worker, went to meet with K.C. at the hospital. K.C. denied she had a mental-health diagnosis or cognitive limitations. She was unable to explain why DDS provided her with services. Mr. Carr then spoke with K.C.'s court-appointed guardian, who was empowered to make legal, financial, and medical decisions for K.C. because she could not make them for herself. The guardian confirmed that K.C. had intellectual deficits, suffered from depression and post-traumatic stress disorder, and received round-the-clock supportive services through Frontline. Next, Mr. Carr participated in a discharge planning meeting for H.C. at the hospital and met with hospital staff and personnel from DDS, Frontline, and the Georgetown Parenting Collaborative ("GPC")[1] to evaluate K.C.'s ability to care for the new-born child. Concluding

---

[1] GPC is a group associated with Georgetown University's Center for Child and Human Development that provides parenting support. K.C. is a voluntary participant in GPC's program, which provided assistance both before and after H.C. was born.

that K.C. lacked that ability, Mr. Carr decided to remove H.C. from K.C.'s care. In the absence of an available kinship placement,[2] CFSA placed H.C. with foster parents when she was discharged from the hospital on December 22, 2015. The following day, CFSA filed a petition in Superior Court alleging that H.C. was a neglected child within the meaning of D.C. Code § 16-2301 (9)(A)(iii) (2012 Repl.) because her mother's intellectual disability and mental health needs rendered her incapable of discharging her parental responsibilities.

The CFSA social worker then assigned to the case was Kristina McTigue. Ms. McTigue, a former special education teacher, had experience working with persons with intellectual and learning disabilities. In determining what reasonable efforts could be pursued to make it possible for H.C. to return safely to K.C.,[3] Ms.

---

[2] CFSA explored the possibility of placing H.C. with her maternal grandmother (i.e., K.C.'s mother), but the grandmother declined to complete the process required to become a licensed kinship foster-care provider. K.C. did not identify any other relative who might have cared for H.C. and, as previously mentioned, the child's father could not be identified.

[3] *See* D.C. Code § 4-1301.09a (b)(3) (2012 Repl.) ("Reasonable efforts shall be made to make it possible for the child to return safely to the child's home."). The statute provides that CFSA is not required to make reasonable efforts to reunite a child with a parent whose "parental rights have been terminated involuntarily with respect to a sibling." *Id.* § 4-1301.09a (d)(2). Although that was the case with K.C., CFSA did not proceed under this exception and the government has not relied on it. We express no view as to its applicability.

McTigue confirmed the services that K.C. already was receiving through DDS. In addition to the help K.C. received from her legal guardian and the individual support provided by Frontline in conjunction with her residential placement (a two-bedroom apartment), these services included psychiatric medication management; other mental health services from a psychologist; enrollment in a day program (known as "Health Tech") that provided job training and instruction on managing daily tasks and activities; and collaborative parenting assistance from GPC and Mary's Center for Maternal and Child Care ("Mary's Center").[4] At the initial hearing in the neglect case on December 24, 2015, Ms. McTigue requested and the court ordered a psychological evaluation of K.C. to assess her current level of cognitive, emotional, and parenting functioning. Pending further developments, the court granted K.C. supervised visitation with H.C. on a schedule of at least twice a week.

K.C.'s psychological evaluation was performed by Dr. Michael Gilliard, a forensic clinical psychologist in the Assessment Center at the District of Columbia Department of Behavioral Health. He diagnosed K.C. as having moderate intellectual disability as well as a major depressive disorder with a history of

---

[4] Mary's Center is a community clinic that provides medical care and social and mental health services.

psychotic symptoms and post-traumatic stress disorder. K.C.'s overall cognitive functioning was in the extremely low range,[5] her overall adaptive functioning was borderline (with variation in her individual skills from extremely low to average),[6] and she displayed a range of depressive symptomatology and serious emotional limitations. Dr. Gilliam found that K.C. possessed "limited" and "impaired" emotional and interpersonal resources and functioning. She displayed "a limited degree of responsibility," "limited self-reliance [and] limited ability to consider the short term or long-term consequences of her actions," "limited temperance" (i.e., self-control and emotional modulation), and "limited empathy," among other deficiencies. Dr. Gilliam also reported that psychometric testing designed to evaluate parental functioning and the potential for child abuse indicated that K.C. had an unrealistically high evaluation of her own abilities and unduly "rigid" attitudes about children. He concluded that K.C.'s deficient cognitive, emotional, and interpersonal resources would make it "significantly challenging" for her to "attempt to successfully independently parent."

---

[5] Her full-scale IQ score of 47 placed her in the bottom .2% of persons her age.

[6] Dr. Gilliam's report states that "[r]elative to individuals of comparable age, currently, [K.C.] is functioning at the 3rd percentile," i.e., below 97% of her peers.

In light of this report and the services already being provided to K.C., Ms. McTigue concluded that K.C. was not in need of any additional or alternative services as part of her case plan. K.C. has never disagreed with that assessment or sought other services or modifications of her programs. K.C. continued to have visits with H.C. twice a week, which Ms. McTigue supervised. The goal of CFSA's case plan was for K.C. to acquire and demonstrate the ability to parent H.C. safely and effectively with the resources and support provided by DDS and her court-appointed guardian, so as to permit reunification. To achieve this goal, in recognition of her intellectual deficits, the plan envisioned (among other things) that K.C.'s service providers and her CFSA social worker would engage with her through repeated behavioral modeling, prompting, and training exercises to help her modify her behavior and learn parenting skills.

The neglect trial was held on March 25 and March 28, 2016. The court received testimony from Dr. Gilliard, Mr. Carr, Ms. McTigue, representatives of Frontline, GPC, and Mary's Center, and K.C. herself. By this time, K.C. had had approximately thirty supervised visits with H.C. The witnesses were in general agreement that K.C. struggled with the basic tasks of parenting and was not able at that time to independently and safely care for the child, though efforts were being made to assist her and tailor parental training and the method of presenting

information to her individual capabilities. K.C. herself did not dispute that she lacked parental skills at that time. The court found H.C. to be a neglected child within the meaning of D.C. Code § 16-2301 (9)(A)(iii) because K.C.'s intellectual disability and mental health needs rendered her incapable of discharging her parental responsibilities. At disposition, the court committed H.C. to the care of CFSA and set reunification as the permanency goal. It found that CFSA had made reasonable efforts to avoid H.C.'s removal, granted K.C. weekly, supervised visitation, and directed CFSA to increase the visitation if possible.

Following the neglect trial, Ms. McTigue continued to work with K.C.'s service providers on the plan that would enable K.C. to make progress towards reunification with H.C. K.C.'s visits with H.C. were increased to four hours per week and moved to K.C.'s home to enable her GPC and Mary's Center trainers to model and teach appropriate parenting behavior in that setting. The parenting training addressed both daily skills of parenting and child development.[7] At GPC's

---

[7] In her testimony at the permanency hearing in this case, Ms. McTigue described the parenting services as follows:

> She has two parenting services in place. Georgetown Parenting Collaborative. Which, if I could wrap it around, focuses on the daily skills of parenting. Feeding a baby. You know, really engaging with the child. Playing with the baby. So on, so forth. The day to day

*(continued…)*

request, Ms. McTigue obtained H.C.'s daily schedule from her foster parents. GPC used this to create a visual calendar for K.C. to assist her in understanding H.C.'s daily needs. K.C. and Frontline staff were kept apprised of H.C.'s physicians and the time and place of her medical appointments so that K.C. could be taken to them. Over the course of the next year, Ms. McTigue held team meetings with all of K.C.'s service providers at least once every month to monitor K.C.'s progress and respond to her needs for assistance. Ms. McTigue's supervisor and other senior CFSA managers also were invited to these meetings.[8]

On June 22, 2016, the court held a hearing to review H.C.'s disposition, the compliance with the case plan, and the progress that had been made toward reuniting K.C. and H.C.[9] It determined at the hearing that although CFSA was

_____

*(…continued)*

> needs of a child. Whereas Mary['s] Center, which is the second collaborative that she's associated with, is more developmental. At nine months, she should have teeth. She should be having, you know, at this age, she should be able to pull herself up. She should be walking. So they, they focus on different aspects of parenting.

[8] Ms. McTigue was assigned to H.C.'s case for approximately one year. In December 2016, another CFSA social worker, Cherie Lopez, took over from her. Ms. Lopez continued the monthly team meetings. They were still being held by the time of the permanency hearing.

[9] *See* D.C. Code § 16-2323 (a)(1), (b) (2012 Repl.).

making reasonable efforts toward the goal of reunification, and K.C. was participating in the parenting and other services provided to her, "the progress that she has made is minor in comparison to what she'll need to make to properly care for her child." The court therefore decided to keep the goal of reunification but add an alternative goal of adoption for CFSA to pursue concurrently.[10] At the next review hearing, held on October 13, 2016, the court maintained these concurrent goals. Again the court expressed its concern that K.C. had made only "minimal progress" toward achieving reunification.

The permanency hearing in this case was scheduled to be held on February 17, 2017.[11] Two months before that date, CFSA filed its pre-hearing report, in which it recommended that H.C.'s permanency goal be changed solely to adoption because K.C. had shown herself unable to acquire the necessary skills to parent the

---

[10] *See* D.C. Code § 4-1301.09a (f) (2012 Repl.) (providing that reasonable efforts to place a child for adoption may be made concurrently with reasonable efforts to preserve and reunify the family and make it possible for the child to return safely to the child's home).

[11] D.C. Code § 16-2323 (a)(4) (2012 Repl.) requires a permanency hearing "for every child within 12 months after the child's entry into foster care and at least every 6 months thereafter, for as long as the child remains in an out-of-home placement." The primary purpose of the hearing is to "determin[e] the permanency plan for the child including whether, and if so when," the child will be returned to the parent or placed for adoption or in another permanent living arrangement. *Id.* § 16-2323 (c).

child independently.  H.C.'s guardian *ad litem* supported this recommendation.  In response, K.C. filed a "statement of counsel" asserting that, as an intellectually disabled mother seeking the return of her child, she is entitled to reasonable accommodations under Title II of the ADA and Section 504 of the Rehabilitation Act of 1973.  K.C. claimed that the evidence to be presented at the permanency hearing would show she "is able to parent her child with reasonable accommodations being made for her disability" and the permanency goal therefore should be to reunite her with H.C.  In support of her claim, K.C. cited a January 29, 2015, letter in which the United States Departments of Justice and Health and Human Services charged the Massachusetts Department of Children and Families with having violated the ADA and the Rehabilitation Act by rejecting an intellectually disabled mother's family reunification plan based on discriminatory and stereotypical assumptions about her disability and without affording her opportunities to benefit from the support of her family and other services that might have enabled her to preserve her relationship with her child.[12]  K.C. asserted that her situation was "similar" to that of the mother in this Massachusetts matter.

---

[12]  Department of Justice/Department of Health and Human Services Joint Letter of Findings:  Investigation of the Massachusetts Department of Children and Families (Jan. 29, 2015), at https://www.ada.gov/enforce_current.htm.

The evidentiary hearing on the permanency plan for H.C. lasted two days.  It commenced on February 17 and concluded, after a break, on April 27, 2017.  The District called K.C. as its first witness.  K.C. testified that Frontline gave her a place to live and provided her with clothing and food to eat, and that she had a nurse who handled her medical appointments and needs.  She did not know why she qualified for her DDS services.  K.C. also did not know why H.C. had been removed from her care.  "They took my baby for no reason," she said, "[a]nd it's not right at all."  K.C. said she had been lied to and that she loved and missed H.C. and wanted her back.

K.C. testified that she had attended all of H.C.'s medical appointments and was present at her then recent one-year check-up.  The only thing K.C. could recall about that check-up was that H.C. had gotten "like, five shots."  K.C. could not say what the shots were for, and she did not know when H.C.'s next medical appointment would occur.  She did not remember the name of H.C.'s doctor.  K.C. could not explain why H.C. had been seeing an immunologist and could not remember anything about her immunology appointments.

H.C. was brought to K.C.'s home for visits on Tuesdays and Thursdays. The visits typically lasted two hours, from 10:30 a.m. to 12:30 p.m.  The foster

parents sent H.C.'s lunch, which K.C. would warm up and feed H.C. K.C. testified that her parenting trainers from Mary's Center and GPC helped her care for H.C. when she came to visit and were teaching her "[h]ow to be a mother" to H.C. The Mary's Center trainer, for example, would "tell" or ask K.C. what "we're going to do" with H.C. During their visits, K.C. changed H.C.'s diaper and played with H.C., sang to her, painted and colored with her, read picture books to her, and showed her pictures. K.C. admitted that she had had problems learning to do things like preparing H.C.'s formula properly, which she attributed to nervousness, but she insisted that it did not take her long to "catch on." She believed she was "a good mother to [her] baby."

K.C. agreed that she would "need help" if H.C. were returned to her care. She said she would need somebody to watch H.C. for her at times, for example, when she had to go to the bathroom or was busy in the kitchen. K.C. acknowledged that she would need assistance with making medical appointments for H.C. and other matters. In addition, K.C. said she would need to place H.C. in daycare so that she could continue to participate in the Health Tech training program or work at a job she had applied for at a Macy's in Prince George's County. K.C. had not identified any suitable daycare program that would be available for H.C.

After K.C., the court heard from the two CFSA social workers, Ms. McTigue and Ms. Lopez; the parent trainers from GPC and Mary's Center who had worked with K.C.; and K.C.'s program manager from Frontline.[13] These witnesses addressed the formulation, implementation, and on-going review of the case plan for reunification, the services and efforts that had been put forth to enable K.C. to achieve the goal of reunification, the extent of K.C.'s progress toward that goal, and the availability of alternatives to termination of her parental rights.

Ms. McTigue and Ms. Lopez testified that K.C. had not advanced beyond supervised visitation and was still unable to provide H.C. with the most basic care. Ms. Lopez, for example, reported that K.C. was still unable to properly perform such tasks as changing H.C.'s diaper or securing her in her highchair and car seat (despite repeated training); to know when to feed H.C. or recognize the child's needs during the visits; or to convey information to H.C.'s doctor about her medical needs. She noted that the activities K.C. engaged in with H.C. were usually led by the GPC trainer. Ms. McTigue similarly testified that for a year she had watched K.C. "immensely struggle to master even the most basic of parenting skills, making a bottle, unbuckling a car seat, and this baby is . . . developing at a

---

[13] The two CFSA witnesses were called by the District in its case-in-chief. The two parent trainers and the Frontline program manager were called by K.C.

normal and rapid rate, and [K.C.] is unable, in my opinion, to meet the needs of that child." For example, despite working with two different parent trainers for a year, K.C. could never master making a bottle independently – she often used too much formula and not enough water or too little formula and too much water and, at times, she overheated the formula in the microwave so that it was too hot for H.C. to drink safely. And after H.C. starting eating solid foods, K.C.'s service providers often had to tell her when it was time for H.C. to eat. Further, according to Ms. McTigue, K.C. "really struggled" with knowing how to comfort H.C. when the child was "clearly discomforted" or in distress. Ms. McTigue also noted that although K.C. received assistance from Frontline and the two parent trainers, they would not step in to serve in a primary caretaking role for H.C. or take responsibility for H.C.'s safety if the child were to reside with K.C.

Both CFSA social workers expressed the concern that K.C. could not maintain a safe environment for H.C. This was a persistent problem over the entire period they had worked with K.C.; when Ms. Lopez (who had taken over the case from Ms. McTigue) was asked whether she had identified any safety concerns during H.C.'s visits with K.C., she answered that she had "observed" K.C.'s "inability to consistently assess the risk and safety" threats to which the child was exposed. The social workers testified to what they considered to be some

illustrative examples of K.C.'s persistent inattentiveness to safety concerns notwithstanding their efforts to sensitize her to them. For instance, K.C. continued to wear acrylic nails that frequently fell off during H.C.'s visits, despite repeated warnings by the social workers and parenting trainers that the loose nails posed a hazard for H.C., who was teething. One time, H.C.'s foster parents found two of the acrylic nails in H.C.'s car seat when she returned home; another time, one of K.C.'s nails was discovered in H.C.'s diaper. When confronted with this problem, K.C. would respond with assurances that she picked up and threw out all of the nails that fell off, but Ms. McTigue continued to find them in places where H.C. could reach them. K.C. also had to be prompted to pick up her earrings off the floor so that H.C. would not place them in her mouth, to remove all of the plastic wrapping from a new toy, and to rinse off H.C.'s pacifier when it fell on the ground.

Toya Buchanan and Clarissa Williamson, the Mary's Center and GPC parent trainers, each met with K.C. twice a week for approximately one to two hours at a time during H.C.'s home visits. They both testified to their observations that, although K.C. still benefited from prompting to recognize and attend to H.C.'s needs and not leave her unsupervised, she had made considerable progress in acquiring basic parenting skills and establishing a nurturing relationship with H.C.

They expressed confidence in K.C.'s ability to attend to H.C.'s daily needs independently, and they confirmed that the supportive services of Mary's Center and GPC would continue to be available to K.C. if she wanted them.

Sophia Johnson, a Qualified Developmental Disabilities Professional with Frontline, testified that K.C. had been receiving a range of services from her organization for the past six years pursuant to an individual behavioral support plan under its contract with DDS and that K.C.'s participation in the program is voluntary. In accordance with her plan, the program provides K.C. with the two-bedroom apartment in which she resides. K.C. is free to come and go as she pleases without supervision, and she leaves her apartment in the morning to attend the day program run by Health Tech, but when she is at home, a Frontline direct support professional is there with her around the clock to help her with all her needs and the activities of her daily life.[14] The direct support professional was present during H.C.'s supervised visits with K.C. Ms. Johnson testified that if H.C. were returned to K.C., they could live together in the apartment and the Frontline support staff on site would be able to assist K.C. with her day-to-day

---

[14] On a typical day, Ms. Johnson explained, one staff member would work from 3:00 to 11:00 p.m., and another staff member then would take over from 11:00 to 7:00 a.m.

parenting, for example by modeling appropriate behavior and advising K.C. on safety issues. The staff would not, however, be able to intervene or make decisions on behalf of the child if a safety issue arose; if necessary they would contact "the proper authorities." The staff could assist K.C. in getting her child to medical appointments or school, but they "would not play any role" in making medical or educational decisions for the child. Nor would Frontline support staff care for H.C. when K.C. would be out at her day program or at work. K.C. "would have to develop a plan for child care, et [] cetera," though Ms. Johnson envisioned that Frontline and "other resource specialists" such as Mary's Center might help "to identify what childcare is available, and what, where her child could go during the day."

Ms. Johnson testified that Frontline and GPC had developed "what we call a safety plan for mom and the baby." "It just outlines some parameters or things, the expectations of being parent, and what you should do and . . . how she could communicate, not only her [own] needs, but the needs of the baby as well, to the DSP [direct support professional]." Otherwise, Ms. Johnson explained, "We necessarily don't develop a plan for the baby." While K.C. has some parenting goals in her own individual support plan, "her plan is going to be for her." Ms. Johnson emphasized that Frontline contracts with DDS to "provide support for

adults with intellectual disabilities" and relies on other services to assist with parent training because "we are not the experts . . . in that realm."

Based on her own observations and interactions with K.C. and the support she had received up to the time of the permanency hearing, Ms. Johnson stated that she did not believe K.C. "could parent independently." Acknowledging that K.C. would "continue to need additional supports as the baby changes and develops," Ms. Johnson said that Frontline "would be there to help and assist, and we still would have to have someone, other additional resources to effectively do that."

Giving the greatest credence to the testimony of Ms. McTigue and Ms. Lopez, the Magistrate Judge found that the District had met its burden to prove by a preponderance of the evidence (1) that CFSA provided K.C. with an appropriate plan for achieving reunification, recognizing that her "mental health is the most significant barrier to reunification"; (2) that CFSA made reasonable efforts to help K.C. ameliorate the conditions that led to H.C.'s removal from her care and achieve reunification; (3) that although K.C. complied with the services and loves her daughter, she failed to make adequate progress toward satisfying the requirements of the case plan to achieve the goal of reunification; (4) that CFSA adequately explored alternatives to the termination of K.C.'s parental rights (i.e., in

the circumstances of this case, a kinship placement); and (5) that adoption was in H.C.'s best interest. Regarding K.C.'s lack of progress toward demonstrating her capacity to parent H.C. safely even with the supports and services provided to her, the Magistrate Judge noted, among other things, that the social workers and K.C.'s parent trainers "sought to model, prompt, and educate [K.C.] on the skills she needed to properly care for [H.C.]," yet their support did not result in K.C. "advancing to unsupervised visits" and she "still required prompting for basic parenting activities, which will undoubtedly become increasingly more complicated as [H.C.] ages." The Magistrate Judge found "no evidence to suggest that [the service providers'] involvement would provide safety for the child to achieve reunification." The Magistrate Judge ordered that the permanency goal for H.C. be changed to adoption.

K.C. requested review of the Magistrate Judge's decision by an Associate Judge in Superior Court. On review, she claimed she had been denied her rights under the ADA and the Rehabilitation Act because (1) CFSA, like the Department of Children and Families in the Massachusetts case, failed to make reasonable accommodations for her intellectual disability in creating and implementing the case plan for H.C.; and (2) the Magistrate Judge did not consider her access to parenting assistance and other resources before finding she did not make adequate

progress towards reunification and could not parent H.C. safely. The Associate Judge rejected K.C.'s claims, finding (1) that CFSA (unlike the agency in the Massachusetts matter) adopted and pursued an appropriate and reasonable plan for reunification based on an individualized assessment of K.C.'s cognitive limitations and the extensive parenting assistance available to her, and (2) that the evidence supported the Magistrate Judge's determination that even with the services and support K.C. received, she did not make adequate progress to meet the plan's requirements for reunification by demonstrating that with appropriate assistance she could parent H.C. effectively and safely. Concluding that the Magistrate Judge had not abused her discretion or otherwise erred in changing H.C.'s permanency goal to adoption, the reviewing judge affirmed the order granting the District's request for that change. This appeal followed.

## II.

Permanency goal decisions are committed to the trial court's "broad discretion," and thus the scope of this court's review of a change in the goal is "limited."[15] While we accord *de novo* review to questions of law,[16] we must defer

---

[15] *In re Ta.L.*, 149 A.3d 1060, 1081 (D.C. 2016) (en banc).

to the trial court's factual findings unless they are clearly erroneous[17] and affirm the court's exercise of its discretion so long as it is "within the range of permissible alternatives, based on all relevant factors and no improper factor."[18]

When the government requests that a neglected child's permanency goal be changed from reunification to adoption, it bears the burden of proving by a preponderance of the evidence "[1] that it has provided the parents with a reasonable plan for achieving reunification, [2] that it expended reasonable efforts to help the parents ameliorate the conditions that led to the child being adjudicated neglected, and [3] that the parents have failed to make adequate progress towards satisfying the requirements of that plan."[19] If the trial court properly finds that the government has made this tripartite evidentiary showing, a goal change to adoption "would be presumptively consistent with the requirement that we act in the best interest of the child"[20] and should be upheld.

---

*(…continued)*

[16] *In re M.V.H.*, 143 A.3d 94, 97 (D.C. 2016).

[17] *Id.*

[18] *In re Ta.L.*, 149 A.3d at 1079 (internal quotation marks omitted).

[19] *Id.* at 1078.

[20] *Id.*

In this appeal, K.C. does not challenge the trial court's determinations that the first two criteria were satisfied, i.e., that CFSA formulated a reasonable plan to address the obstacles to reunification arising from K.C.'s cognitive disabilities, and that CFSA expended reasonable efforts to implement that plan and help K.C. achieve reunification by demonstrating her capacity with appropriate support to parent H.C. safely and without jeopardizing the child's health and welfare. Indeed, neither in the trial court nor in this appeal has K.C. identified any shortcoming in the reunification plan or in CFSA's efforts to help her attain her goal. K.C. challenges only the trial court's finding that the third criterion was satisfied, i.e., that she did not make adequate progress toward satisfying the requirements of the plan. In making this finding, K.C. asserts, the court "failed to give adequate consideration to [her] right to reasonable accommodations" under the ADA and the Rehabilitation Act.[21] More specifically, K.C. claims the evidence established that "she could effectively and safely parent [H.C.] with the assistance of Frontline and the other services that are available to her."[22] K.C. argues that Frontline would provide a home for her and H.C. and "24 hour supervision to assist [her] in caring for the child," and that she also would have the services of her "parenting tutors"

---

[21] Br. for Appellant at 9.

[22] *Id.*

and "the assistance of [her] court-appointed guardian."[23] These services, K.C. argues, "constitute [the] reasonable accommodations to which she is entitled [under the ADA and the Rehabilitation Act]."[24]

We take no issue with K.C.'s contention that Title II of the ADA and Section 504 of the Rehabilitation Act entitled her to reasonable accommodation of her intellectual and psychiatric disabilities in the provision of reunification services and the proceedings to determine the permanency goal for her child. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[25] Section 504 applies this same requirement to entities that receive federal financial assistance.[26] Entities subject to these requirements must make "reasonable modifications" in their policies, practices, and procedures to avoid discrimination and allow disabled persons to participate in and receive the

---

[23] *Id.* at 10.

[24] *Id.* at 9.

[25] 42 U.S.C. § 12132 (2016).

[26] 29 U.S.C. § 794 (a) (2015).

benefits of their services and programs.[27]   We agree with the numerous other courts that have held or assumed that these requirements apply to reunification services provided by states to parents whose children have been removed in neglect proceedings.[28]   We consider this requirement of reasonable accommodation to be entirely consistent with, and perhaps subsumed within, CFSA's general statutory obligation to expend reasonable efforts to make reunification possible.[29]  It is necessary for present purposes to be clear about what Title II and Section 504 do and do not require, however.

Guidance on this subject is provided in a 2015 publication of the Department of Justice and the Department of Health and Human Services entitled "Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical

---

[27]  28 C.F.R. § 35.130 (b)(7) (2017); *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017); *Alexander v. Choate*, 469 U.S. 287, 299-301 (1985).

[28]  *See, e.g.*, *Lucy J. v. State Dep't of Health & Social Servs.*, 244 P.3d 1099, 1115-16 (Alaska 2010); *People ex rel. C.Z.*, 360 P.3d 228, 234 (Colo. App. 2015); *In re Elijah C.*, 165 A.3d 1149, 1164-66 (Conn. 2017); *Adoption of Gregory*, 747 N.E.2d 120, 125-26 (Mass. 2001); *In re Hicks/Brown*, 893 N.W.2d 637, 640 (Mich. 2017); *State ex rel. K.C. v. State*, 362 P.3d 1248, 1252 (Utah 2015).

[29]  *See* D.C. Code § 4-1301.09a (2012 Repl.).  *Cf. Lucy J.*, 244 P.3d at 1116 ("[T]he question whether reunification services reasonably accommodated a parent's disability is already included within the question whether active or reasonable efforts were made to reunite the family."  (footnote omitted)).

Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act" (hereinafter referred to as the "DOJ/HHS Technical Assistance").[30] As this publication explains, child welfare agencies and courts may not "engage in practices or methods of administration that have the effect of discriminating on the basis of disability, or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the child welfare agency's or court's program for persons with disabilities."[31] Rather, it is "fundamental" to Title II of the ADA and Section 504 that child welfare programs must be administered in accordance with the principles of individualized treatment and full and equal opportunity.[32]

The principle of individualized treatment means that persons with disabilities "must be treated on a case-by-case basis consistent with facts and

---

[30] Available at https://www.ada.gov/doj_hhs_ta/child_welfare_ta.pdf.

[31] *Id.* at 4 (citing 28 C.F.R. § 35.130 (b)(3) (2017); 45 C.F.R. § 84.4 (b)(4) (2017); 28 C.F.R. § 42.503 (b)(3) (2017)).

[32] *Id.*

objective evidence," and "not . . . on the basis of generalizations or stereotypes."[33]

Thus, Title II and Section 504 prohibit "the removal of a child from a parent with a disability based on the stereotypical belief, unsupported by an individual assessment, that people with disabilities are unable to safely parent their children."[34]

In the present context, the principle of full and equal opportunity means that "[i]ndividuals with disabilities must be provided opportunities to benefit from or participate in child welfare programs, services, and activities that are equal to those extended to individuals without disabilities."[35] In order to achieve that goal, agencies must make reasonable changes in their practices and services to accommodate the individual needs of disabled parents.[36] For example, for parents like K.C. who have cognitive or other mental disabilities and need help acquiring

---

[33] *Id.* (citing 28 C.F.R. § 35.130 (b); 28 C.F.R. pt. 35, App. B (2017); and *School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 285 (1987)).

[34] *Id.*

[35] *Id.* (citing 28 C.F.R. §§ 35.130 (b)(1)(ii)-(iv), (vii), (b)(7); 45 C.F.R. § 84.4 (b)(1)(ii)-(iii); 28 C.F.R. § 42.503 (b)(1)(ii), (iii)).

[36] A change is not required, however, if it would fundamentally alter the nature of the service, program, or activity in question or would result in undue financial or administrative burdens. *See id.* at 10 n.67 (citing 28 C.F.R. § 35.130 (b)(7); 45 C.F.R § 84.22 (a)).

parenting skills, "child welfare agencies may be required to provide enhanced or supplemental training, to increase frequency of training opportunities, or to provide such training in familiar environments conducive to learning,"[37] and to "incorporate the use of visual modeling or other individualized techniques to ensure equal opportunity to participate in and benefit from the training."[38] Courts likewise must modify their policies, practices and procedures to the extent reasonably necessary to avoid discriminating against disabled parents in permanency and other proceedings, for example by providing assistance to enable such parents to participate fully in the proceedings,[39] and by exercising discretion – where authorized and consistent with the best interests of the children involved in the proceedings – to allow more time to permit disabled parents, with appropriate supportive services, to achieve goals for reunification.[40]

---

[37] *Id.* at 10.

[38] *Id.* at 15; *see, e.g.*, *State ex rel. K.C.*, 362 P.3d at 1254 (child welfare agency reasonably accommodated mother with mental illness by adopting recommendations of mental health professionals, providing extra peer parenting sessions, and allowing mother additional time to complete tasks); *cf. Hicks/Brown*, 893 N.W.2d at 642 (child welfare agency failed to make reasonable efforts to reunify mother with her child when it ignored recommendations of medical professionals that mother would benefit from services tailored to her disability).

[39] DOJ/HHS Technical Assistance at 9.

[40] *See id.* at 13-14.

Importantly, these requirements do not mean the "lowering [of] standards for individuals with disabilities."[41] Child welfare agencies and courts are obligated to ensure the health and safety of children.[42] The ADA and the Rehabilitation Act do not override that obligation; they incorporate an exception where an individual with a disability poses a "direct threat," meaning "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services."[43] Thus, "in some cases, a parent or prospective parent with a disability may not be appropriate for child placement because he or she poses a significant risk to the health or safety of the child that cannot be eliminated by a reasonable modification."[44] The ADA and the Rehabilitation Act permit a child welfare agency or a court to make that determination in a given case, "based on an individualized assessment and

---

[41] *Id.* at 5.

[42] *Id.* at 16.

[43] *Id.* (citing 28 C.F.R. § 35.139(b); *Arline*, 480 U.S. at 288).

[44] *Id.* at 5; *see, e.g.*, *State ex rel. K.C.*, 362 P.3d at 1253 ("[T]he ADA requires only *reasonable* modifications…. In assessing what sorts of modifications to the plan might be reasonable, . . . the juvenile court was entitled to take into account the core principles and policies of our Termination of Parental Rights Act – including, of course, 'the paramount concern,' which is the best interest of the child.") (emphasis in the original).

objective facts, including the nature, duration, and severity of the risk to the child, and the probability that the potential injury to the child will actually occur."[45]

The trial court made just such a determination in this case, albeit implicitly, in finding that even with all the individualized assistance and support provided and available to K.C., she had not made adequate progress toward reunification and could not care for H.C. safely and effectively now or in the foreseeable future. Taken as a whole, the evidence before the court supported that determination. Like the trial court, we are not without empathy for K.C. and her maternal desire to keep H.C. in her life, but the evidence supported a conclusion that K.C.'s cognitive limitations make it impossible for her to do so without endangering the child she loves. The testimony of the CFSA social workers in particular supported the court's conclusions that, despite some modest improvements in her parenting skills, K.C. never reached the point where unsupervised (or even prolonged) visitation with H.C. could be considered. Without constant oversight, assistance, and prompting, witnesses testified that K.C. was unable, even during the brief supervised visits, to maintain a safe environment for H.C., to perform basic and routine caregiving tasks, or to recognize and attend properly to H.C.'s basic needs.

---

[45] DOJ/HHS Technical Assistance at 5; *see* 28 C.F.R. § 139 (b).

She also was unable to make informed medical and educational decisions on H.C.'s behalf.

Nor, critically, did the evidence establish that if H.C. were returned to K.C.'s full-time care, her well-being would be ensured by the round-the-clock presence of Frontline staff in the apartment and the occasional additional support provided by GPC, Mary's Center, and K.C.'s court-appointed guardian. H.C. required a capable parent. These service providers might be available to advise and prompt K.C. and attempt to intervene when they perceived H.C.'s safety to be jeopardized, but they could not serve as surrogate parents or guardians for H.C. and they were not about to assume direct responsibility for the child's care and upbringing. Important and valuable as their services were to K.C., their roles were limited. Frontline's program manager confirmed that the staff were there to support K.C.'s needs, not those of her child. There is no evidence that Frontline personnel had the responsibility or training to protect or care for a small child or ensure that K.C. did so properly, let alone to take charge of all the manifold tasks and make all the vital judgments involved in raising the child. Moreover, Frontline staff would not always be present. K.C. was free to go out on her own and come and go as she pleased, without supervision, and she would be free to take her child with her. In addition, there was no evidence as to who (if anyone) would be available to care

for H.C. when K.C. was attending her day program or receiving mental health services or out for other reasons; but even if H.C. were to be provided with adequate daycare during those periods of K.C.'s absence, concerns about her ability to parent H.C. at other times would still be determinative. Similarly, the involvement of GPC and Mary's Center trainers was limited to only a few hours a week, and they too were not directly responsible for providing child care. And K.C.'s court-appointed guardian was charged with making legal, financial, and other decisions for K.C. herself, not for K.C.'s child. K.C. had the parental authority to make the innumerable, important life decisions for and affecting H.C. – but not, the evidence showed, the judgmental capacity to exercise that authority properly for the safety, health and welfare of the child.

K.C. nonetheless claims that her case resembles the 2015 case in which the Departments of Justice and Health and Human Services found violations of the ADA and the Rehabilitation Act by the Massachusetts Department of Children and Families ("DCF").[46]  We disagree. Although the Massachusetts case also concerned the adequacy of accommodations for an intellectually disabled mother

---

[46]  *See* Department of Justice/Department of Health and Human Services Joint Letter of Findings: Investigation of the Massachusetts Department of Children and Families (Jan. 29, 2015) ("DOJ/HHS Letter"), at https://www.ada.gov/enforce_current.htm.

seeking reunification with her child and a change in the child's permanency goal to adoption, it otherwise bears little resemblance to this case. In the Massachusetts case, unlike in this one, the child's mother lived with her parents, i.e., the child's grandparents, who were not disabled and who desired to provide full-time, permanent support in their home for both their daughter and her baby, with the grandmother maintaining guardianship of the child. Unlike in this case, there was substantial evidence in the Massachusetts case that this family plan for reunification was a viable and attractive option – according to the DOJ/HHS Letter, "multiple community-based service providers, two experts who ha[d] completed parenting assessments, [the child's] court-appointed attorney, and even a majority of DCF's most recent Foster Care Review panel all ha[d] agreed that [the] family-supported parenting plan would be appropriate."[47] Unlike in this case, the agency rejected this option, withheld support services from the mother, and restricted her visitation with her child, based (the DOJ/HHS Letter found) not on an individualized assessment of the evidence, but on stereotypical, discriminatory assumptions about the mother's disability.

---

[47] DOJ/HHS Letter at 2.

We conclude that the trial court in the present case did not violate the ADA or the Rehabilitation Act in finding that even with the services and support K.C. received, she did not make adequate progress to meet the plan's requirements for reunification or demonstrate that with appropriate assistance she could parent H.C. without jeopardizing the child's safety, health, and welfare. We perceive no abuse of discretion in the court's decision to change H.C.'s permanency goal to adoption.

*Affirmed.*